431 F.2d 714
 J. RAY McDERMOTT AND COMPANY, Inc., Plaintiff-Appellee, Cross Appellant,
v.
The VESSEL MORNING STAR et al., etc., the Fish Meal Company, Harvey W. Smith, Defendants-Appellants, Cross Appellees, and
Texas Menhaden Company, Intervenor-Appellant, Cross Appellee.
 No. 28496
 United States Court of Appeals, Fifth Circuit.
 September 15, 1970.
 
 Frank J. Peragine, William S. Stone, New Orleans, La., Bryan J. McGinnis, Beaumont, Tex., for appellants.
 Dave McNeill, Jr., Robert M. Julian, Houston, Tex., Neal D. Hobson, Kennedy J. Gilly, New Orleans, La., for appellee.
 Before BELL, COLEMAN, and AINSWORTH, Circuit Judges.
 COLEMAN, Circuit Judge:
 
 
 1
 This appeal presents a contractual Humpty Dumpty which no court could ever put together again. By failing in advance to protect themselves from the consequences of serious errors of judgment, the litigants have taken costly falls from a wall of their own making. They have repaired to the courts for succor, but there are situations which no court can cure. Adding to the pain of past misfortunes, we are compelled to reverse the judgment of the court below and to remand the litigation for a new trial.
 
 * BACKGROUND
 
 2
 J. Ray McDermott and Company, Inc., hereinafter referred to as McDermott, builds ships at its shipyard in Morgan City, Louisiana.
 
 
 3
 The Texas Menhaden Company (located in Sabine Pass, Texas) and The Fish Meal Company (located in Morgan City) are two of many corporations owned by the Smith family, giants of the menhaden fishing world. Harvey W. Smith was President of both companies. The companies and their President will generally be referred to in the course of this opinion as the Smith interests.
 
 
 4
 In the United States menhaden are not considered to be edible fish. Their primary use is for fertilizer and chicken feed. In other countries, particularly in Europe, menhaden are manufactured into margarine. In the Gulf of Mexico, menhaden fishing is a seasonal activity, lasting from April to October. The menhaden are caught in shallow waters, generally at depths of from eight to twelve feet. The typical menhaden fishing boat is from 125 to 220 feet in length. It is not unusual for these boats to plow through soft mud, beneath shallow waters, to reach the menhaden schools. When a school is sighted the boat casts off two "purse boats," usually about 35 footers, which, operating under their own power and with a net between them, surround the school. By the use of hydraulically powered winches, the nets are drawn tight around the fish. The mother ship then comes alongside and pumps the catch from the purse into the cargo holds. The fish are there kept in a chilled condition and taken to nearby plants for processing. The captains and the crews are compensated according to the catch, and the competition among fleets from about fifteen menhaden plants along the Gulf Coast may aptly be described as terrific.
 
 
 5
 McDermott shipyard in Morgan City was located about a mile from the menhaden processing plant of The Fish Meal Company and for several years McDermott had repaired the menhaden fishing boats and proclaimed that it kept in its employ a full time naval architect. Prior to the fall of 1965, however, McDermott had never built a menhaden fishing boat.
 
 
 6
 Alfred Davies was the manager of the menhaden processing plants owned by The Fish Meal Company at Morgan City, Louisiana, and by Texas Menhaden Company at Sabine Pass, Texas. He knew that McDermott had never built a menhaden boat. V. J. LeBlanc was the general manager of the McDermott shipyard. In October, 1965, verbal negotiations between Davies and agents of McDermott culminated in a written contract for the construction of eight menhaden fishing vessels.
 
 
 7
 The proposal and acceptance on behalf of the parties read as follows:
 
 
 8
 "September 15, 1965
"Texas Menhaden Company
P. O. Box 68
Sabine Pass, Texas

Attention: Mr. Al Davies

Subject: Construction of Eight (2) 165'
 × 35' × 14' Menhaden Fishing Vessels.
 (Emphasis by the Court).
 McDermott Shipyard Proposal No.
 Q-1136.
 
 Gentlemen:
 
 9
 "We propose to furnish labor, material, and plant facilities to construct, outfit, and deliver each of eight (8) subject vessels for the sum of Three Hundred Twenty-One Thousand Seven Hundred Sixty-Nine Dollars and No/Cents ($321,769.00), which is a total of Two Million Five Hundred Seventy-Four Thousand One Hundred Fifty-Two Dollars and No/Cents ($2,574,152.00) for all eight (8) vessels, in accordance with applicable specifications and subject to the following conditions.
 
 
 10
 "1. Applicable Specifications are those entitled `Specifications for the Construction of a 165' Menhaden Fishing Vessel for Texas Menhaden Company, Sabine Pass, Texas', dated September 13, 1965, prepared by McDermott Shipyard, Morgan City, Louisiana, and the accompanying contract plans as listed therein.
 
 
 11
 "2. In connection with Item 110, Page 4 of Specifications, it is understood that Shipyard will install refrigeration equipment, fish pump, and hardening winch on their foundations. The respective refrigeration, fish hold, and hydraulic winch piping systems are not included in this proposal but will be subject to the terms of Item 109, Page 3 of Specifications.
 
 
 12
 "3. In connection with Item III, Page 7 of Specifications, we have included in our proposal coordination and witnessing of tank testing. Costs of model and towing tank tests, as well as traveling and incidental expenses, are not included.
 
 
 13
 "4. We will deliver the subject vessels floating alongside our pier on or before June 1, 1966, provided this proposal is accepted within five (5) days of the date of this letter.
 
 
 14
 "5. Terms of payment are to be subject to a separate agreement but will be, in general, as follows:
 
 
 15
 a. The total sum will be financed by the Builder at an interest rate of six percent (6%) on the unpaid balance for a period of thirty-six (36) months.
 
 
 16
 b. Interest will start accruing on the following percentages of the unpaid balance according to the following schedule:
 
 
 17
 1) On twenty-five percent (25%) of total sum outstanding upon acceptance of proposal.
 
 
 18
 2) On fifty percent (50%) of total sum outstanding on February 15, 1966.
 
 
 19
 3) On one hundred percent (100%) of the total sum outstanding on each vessel upon completion of each vessel, as per applicable specifications.
 
 
 20
 c. Capital and interest payments will be made at equal intervals for a period of thirty-six (36) months from completion of each vessel, as per applicable specifications. Payment intervals are to be determined in above mentioned separate financial agreement.
 
 
 21
 "This quotation is valid for a period of ten (10) days from the date of this letter, after which time, we reserve the right to withdraw or amend the same. `The quoted prices do not include any Louisiana State or Parish Sales or Use Taxes. If any such taxes are due, they will be paid by you or reimbursed to us if it is necessary that we pay them'. J. Ray McDermott & Co., Inc. operates in the State of Louisiana under Louisiana State Contractors License No. 246.
 
 
 22
 "We thank you for the opportunity to submit this proposal and should you find it satisfactory, please sign and return the original.
 
 
 23
 "Very truly yours,
 McDERMOTT SHIPYARD
 s/ V. J. LeBlanc
 V. J. LeBlanc
 Division Manager

VJL:ml

"ACCEPTED: TEXAS MENHADEN
 COMPANY

BY: s/Harvey Smith
DATE: 10/5/65".
 
 
 24
 It is at once apparent from the caption of McDermott's proposal that it agreed to build and the Smith interests expected to receive vessels suitable for menhaden fishing. It is equally apparent from paragraph 1 of the proposal that the applicable specifications were to be those prepared by McDermott.
 
 
 25
 Section 1, paragraph 101, of these specifications provided that McDermott should deliver to Texas Menhaden "an all welded, twin screw diesel powered vessel for pursing and trawling in the Gulf of Mexico". It was further specified that the design criteria for this vessel [of which there were to be eight] would provide for a free running speed, when light, of about 14¾ miles per hour, with a fish hold capacity of about 700 short tons of menhaden. It was additionally specified that ship draft, light, would be approximately 6 feet, 6 inches. Loaded draft would be 9 feet, 6 inches.
 
 
 26
 The contract was made in Louisiana. The ships were to be built in Louisiana and delivered in Louisiana.
 
 
 27
 The shipbuilder, with no prior experience in the field, did not build one vessel and test it with a regular menhaden crew under actual fishing conditions before building the other seven. The Smith interests did not insist on such a procedure. The Smiths wanted speedy delivery and McDermott was willing to comply. Like Admiral Farragut at Mobile, but without his famed success, both parties steamed full speed ahead with little regard for the torpedoes, until it was too late.
 
 
 28
 The first four of the projected eight vessels were delivered by McDermott in the middle of June, 1966. As per the contract, the Smiths outfitted the vessels with engines and fishing equipment. The weight of these various appurtenances, including the concrete lining in the holds, accounted for a nine inch increase in the draft of the vessels.
 
 
 29
 Two marine architects and the captains of the vessels after they had set out to fish testified that the boats were wholly unsatisfactory for the use intended and were, in fact, unseaworthy. There was testimony that with only 500 tons of fish in the holds the boats drew as much as 14½ feet of water, whereas the contract specified that draft would be 9 feet, 6 inches when loaded with 700 tons of fish. The excess draft allegedly impaired the ability of the mother ship to operate in the shallow waters where menhaden are ordinarily found. The captains further testified that the boats were "out of trim" and suffered from a "quick roll" which rendered the raising and lowering of the purse boats and the loading of the fish dangerous to the crews.
 
 
 30
 McDermott's naval architect had never designed a menhaden boat. The Smith interests had no naval architect. McDermott agreed to design the boats. With the full knowledge of the Smiths the design was adapted from plans for an off shore supply boat which McDermott had never built.
 
 
 31
 Not to be outdone by McDermott's gamble, on October 28, 1966, while attempts were being made to use four of the boats, The Fish Meal Company went ahead and executed a promissory note for the full contract price for the vessels. Harvey W. Smith, in his personal capacity, at the bottom of the note, signed a written guarantee of payment. As a condition to the execution of the note and mortgages, the Smith interests requested and received a reservation of all of Smith's rights under the construction contract. The note and preferred ship mortgages were duly registered at the Customs House in New Orleans pursuant to the Federal Ship Mortgage Act, 46 U.S.C. § 911 et seq.
 
 
 32
 Later, when the boats allegedly proved to be unfit, the Smith interests, with the consent of McDermott, tried to sell them to be used for some other purpose. These efforts failed.
 
 
 33
 The result of all this was that McDermott found itself carrying a note for $3,233,891.36 (secured by preferred ship mortgages) which the Smiths refused to pay. Simultaneously, the Smiths claimed to be saddled with eight boats which were useless for menhaden fishing. Not being able to resolve their differences (or refusing to do so), the parties looked to non-seagoing courthouses for a remedy.
 
 II
 
 THE LITIGATION
 
 
 34
 In the United States District Court for the Eastern District of Louisiana, the Smith interests sued McDermott for breach of contract and for a declaration of non-liability under the notes and mortgages, alleging failure of consideration.
 
 
 35
 The boats had been laid up in a freshwater bayou near Bridge City, Texas, to prevent deterioration. So, in the United States District Court for the Eastern District of Texas, at Beaumont, McDermott filed a mortgage foreclosure suit against the vessels in rem and also against the maker and endorser of the note, The Fish Meal Company and Harvey W. Smith, in personam. McDermott had the vessels seized.
 
 
 36
 McDermott then sought to dismiss, or alternatively to stay, the breach of contract action brought in New Orleans.
 
 
 37
 The upshot was that the parties STIPULATED both the transfer of the breach of contract action to the district court at Beaumont and the judicial sale of the vessels under the direction of that Court, the proceeds to be deposited in the Registry to await the outcome of the litigation.
 
 
 38
 After due advertisement, the vessels were sold at public auction by the United States Marshal at Beaumont. For reasons not apparent in the record the Smith interests sought no independent appraisal of the vessels prior to the Marshal's sale. Neither did McDermott. The highest bid for all eight vessels was $689,000, submitted by McDermott. The sale to McDermott was confirmed without opposition. McDermott made bond for the net proceeds of the sale, to abide the outcome of the litigation.
 
 
 39
 Thereafter, the cases were consolidated for trial. The result was that two trials proceeded simultaneously. McDermott's mortgage foreclosure action was tried to the Court and the Smith suit for breach of contract went to a jury.
 
 
 40
 The first special interrogatory submitted to the decision of the jury was: "Do you find from a preponderance of the evidence that the vessels were constructed by J. Ray McDermott and Company, Inc. in accordance with the contract specifications and drawings as amended without any material variance?"
 
 
 41
 To this the jury answered: "Yes".
 
 
 42
 At the trial level this put an end to the Smiths' law suit, except for the contention that because McDermott took advantage of a "waiver of appraisal" clause in the mortgage and allowed the mortgaged property to be sold without an appraisal no deficiency judgment could be taken against Fish Meal and Harvey Smith personally since such was prohibited by the Louisiana Deficiency Judgment Act, LSA-R.S. 13:4106.
 
 
 43
 The Smiths moved for a new trial because of asserted prejudicial instructions to the jury and because the verdict was contrary to the weight of the evidence. They also moved for a summary judgment in their favor as to any deficiency. These motions were denied.
 
 
 44
 As to McDermott's mortgage foreclosure action, the Court entered its own findings of fact and conclusions of law, granting judgment against Fish Meal and Harvey Smith, in personam, for the full amount of the note, plus interest and attorneys fees, subject to a credit for the net proceeds of the Marshal's sale, and subject to further credit equal to whatever profit (if any) which McDermott might later realize from resale of the vessels. The district court was moved to the latter requirement because, as matters stood, McDermott became the owner of the vessels in question for $689,000, and it likewise became the owner of a judgment against the Smith interests, in personam, for over $2,500,000, when the original contract price for the vessels amounted to $2,574,152. In other words, McDermott got its $2,574,142 worth of vessels (contract price) for $689,000. In addition, McDermott acquired the engines and other valuable property installed in the vessels by the Smith interests at a cost of about a million dollars.
 
 
 45
 On the other hand, if McDermott could obtain no deficiency judgment against Fish Meal and Harvey Smith, then it simply got its boats back (plus equipment) — boats which had theretofore proven to be unsellable.
 
 
 46
 The Smith interests have appealed from both judgments, and McDermott has appealed from that portion of the judgment in the foreclosure suit which requires it to account for and to credit the deficiencies with any profit which might be realized from the subsequent sale of the vessels previously seized and sold by the Marshal.
 
 
 47
 In our opinion, the judgment on the jury verdict must be reversed because of an error in the instructions to the jury. This likewise requires that the judgment for McDermott in the foreclosure proceeding be vacated. This renders it unnecessary that we should reach or decide the cross appeal filed by McDermott.
 
 III
 
 THE TRIAL
 
 
 48
 It was McDermott's position that it had delivered the ships without material variance from the contractual specifications and was entitled to be paid.
 
 
 49
 The Smith interests claimed a failure of consideration caused by McDermott's breach of contract in the following particulars:
 
 
 50
 1. Excess draft; inability to fish in shallow waters;
 
 
 51
 2. Complete uselessness of at least one-third of the hold space; lack of the contractual capacity of 700 tons;
 
 
 52
 3. Lack of trim, making it impossible to properly steer the vessels;
 
 
 53
 4. The quick roll characteristic of the vessels;
 
 
 54
 5. Inability to lower, raise, and tow the purse boats; 6. Flat bottoms on the vessels rather than the true "V" bottom required for menhaden fishing in shallow waters.
 
 
 55
 The Smiths also claimed damages for the alleged breach of contract.
 
 
 56
 McDermott countered with the contention that after the execution of the written contract the Smith interests had ordered various changes (or innovations) in the vessels which materially altered the contract and which had affected the ultimate performance of the vessels in the particulars complained of.
 
 
 57
 To this the Smiths responded that the primary requirements of the contract, suitability for menhaden fishing, draft, fish hold capacity, and general seaworthiness had never been changed; that they relied on McDermott's naval architects to preserve these indispensable features because McDermott undertook the design of the vessels to accomplish the purposes intended.
 
 
 58
 We do not set forth a witness by witness resume of the lengthy trial testimony. The evidence for one side contradicted that of the other in many particulars. McDermott's managers and Smith's managers rarely agreed on anything. The naval architects called by both sides were in material disagreement. The testimony of the ship captains as to the defects of the vessels was largely, if not altogether, uncontradicted. The credibility of the witnesses and the weight of their testimony, if any, within the appropriate rules, were for the resolution of the jury.
 
 
 59
 In his instructions to the jury the trial judge stated, inter alia:
 
 
 60
 "The Court would instruct you further that the fact that the vessels did not prove suitable for fishing would not indicate that the vessels were not constructed in accordance with the contract, because the very conception of the vessel was an innovation and it was thought, no doubt with good faith on the part of both parties, that this type of vessel would prove suitable and desirable for fishing.
 
 
 61
 "[I]f you find that they were not suitable for fishing, — that in itself does not mean that the contract was breached and the vessels were not constructed in accordance with the terms of the contract."
 
 
 62
 Before the jury retired to consider its verdict, the Smiths duly objected to this language. The objection was overruled. This is the basis for one facet of the appeal.
 
 
 63
 In the conclusion of its instructions, the Court continued:
 
 
 64
 "In making this determination you must take into consideration whether or not McDermott constructed the vessels without any material variance, in accordance with the terms, conditions, specifications and drawings as amended and furnished the defendant. If you find that they were from a preponderance of the evidence, then you will find in favor of McDermott."
 
 IV
 
 THE DECISION
 
 
 65
 Both San Miguel, a graduate of M.I.T., the naval architect and chief engineer in the full time employ of McDermott, and LeBlanc, the general manager for McDermott, testified that Davies, general manager for the Smiths, selected the drawings (in McDermott's possession) of a supply boat and directed that it be converted to a vessel which could be used for menhaden fishing during the menhaden season and for trawling at other seasons. Mr. LeBlanc said that San Miguel "changed the specifications as Mr. Davies wanted them changed". Davies denied this. He claimed that he did not tell San Miguel how to draw the plans and specifications for the boats nor did he tell them what kind of boat to use as a model in their design. He contended that no one connected with Smith interests had anything to do with the design or the configuration or construction of the boat. He contended that LeBlanc told him that San Miguel would be the one who would handle the design, that he was a top notch marine architect.
 
 
 66
 The answer to these oral disputes, however, is found in the language contained in paragraph 1 of McDermott's contract proposal of September 15, 1965 [page 716, ante] which caetgorically states that the specifications are those "prepared by McDermott Shipyard, Morgan City, Louisiana, and the accompanying contract plans as listed therein".
 
 
 67
 Captain William H. Fortner took one of the vessels, the DOUBLE-O-SEVEN, to fish when it came out of McDermott's yard. He testified that the boat drew 9 feet light, that once when 75% loaded the boat drew 14 feet at the bow and 12½ feet at the stern, and that San Miguel saw it. The DOUBLE-O-SEVEN went aground on one occasion while other boats were fishing all around it and had to be pulled out by a tug boat. Fortner was the only man who could steer the vessel and "not too good". He had trouble with the trim, "she would drop to one side or the other". In his opinion, the boat was not seaworthy. He agreed to serve as captain because San Miguel "told me she was going to be the best pogy boat, menhaden boat, in the Gulf, that he was a naval architect and I was not, and I thought I could be wrong about the boat". Mr. Davies also told him she would be a good boat. The boat was too flat bottomed. It could not tow purse boats. When asked if he would go back on this boat and take her to sea, he replied, "They don't have enough money".
 
 
 68
 Captain Douglas Brill, skipper of the MUD LUMP, testified to like effect and pronounced the vessel unseaworthy.
 
 
 69
 It was then stipulated that six other witnesses, listed by name, would, if called, give similar testimony with reference to their efforts to operate these boats for menhaden fishing.
 
 A. The Breach of Contract
 
 70
 It is undisputed that these parties had a written contract. The contract proposal recites that McDermott prepared the plans and specifications. The contract therefore is entitled to a strict construction against McDermott, Lawson v. Martin Timber Company, 1959, 238 La. 467, 115 So.2d 821. Unambiguous contracts cannot be destroyed by ambiguous circumstances, Cardos v. Cristadoro, 1956, 228 La. 975, 84 So.2d 606. He who prepares the plans and specifications of a structure and afterwards contracts for its construction according to the plans and specifications is responsible for any defect or insufficiency in the specifications. He cannot escape responsibility for defectiveness of the work by taking the ground that the defect was in the specifications rather than in the work. He is responsible for both. Barraque v. Neff, 1942, 202 La. 360, 11 So.2d 697, citing Louisiana Molasses Company v. LeSassier, 52 La. Ann. 2070, 28 So. 217.
 
 
 71
 McDermott knew when it undertook the preparation of the specifications and the construction in accordance therewith it was embarking upon a new activity. McDermott's proposal stated that it was to build menhaden boats and it is clear that McDermott knew the proposed vessels would be unlike any other menhaden boat previously in use. Yet, the contract contains no reservations or exceptions for the consequences of novelty or faulty design.
 
 
 72
 We see nothing ambiguous about the terms of this contract. There is no contention that the parties labored under any mistake or fraud. Therefore, the contract as written must govern the relationship of the parties and their respective obligations, and the intent of the parties is to be determined by the language of the contract, Vaughan v. P. J. McInerney and Company, La.Ct. of App., 1943, 12 So.2d 516, 518; Bank of Napoleonville v. Knobloch & Rainold, 1918, 144 La. 100, 80 So. 214; Fitzgerald v. Hyland, 1942, 199 La. 381, 6 So.2d 321.
 
 
 73
 It is true that after the execution of the instruments evidencing the original contract, changes were made in the vessels at the solicitation of Harvey Smith, such as, the stern was raised two feet higher, a ramp was installed, and the engine houses were moved forward.
 
 
 74
 There was testimony in the record that San Miguel issued no warning that these changes would interfere with the efficiency or seaworthiness of the vessels. If the changes were likely to produce negative results in these respects it was San Miguel's duty to warn of these possibilities, if they were to be chargeable to the Smiths, Kunnes v. Bryant, La.Ct. of App., 1951, 49 So.2d 872.
 
 
 75
 Thus, we have a case in which a party contracted to construct vessels which would be menhaden boats of prescribed draft and fish hold capacity. There was abundant testimony, if a jury had chosen to believe it, that these specifications had not been met. Obviously, the Smiths were entitled to expect delivery of seaworthy vessels. Again, there was abundant testimony, if the jury had chosen to believe it, that this had not been accomplished.
 
 
 76
 We are therefore driven inescapably to the conclusion that under the law and the facts of this case it was error for the district judge to tell the jury that the unsuitability of the vessels would not indicate that they had not been constructed in accordance with the contract. For this reason, the judgment in the breach of contract — failure of consideration action must be reversed and remanded for a new trial to be conducted consistently with the principles herein announced.
 
 
 77
 As to the complaint in admiralty against the vessels in rem, to foreclose the mortgages, and to obtain a deficiency judgment against the makers of the note secured by the mortgages, in his findings of fact and conclusions of law the trial court states, "The court agrees with the jury's finding that the vessels were constructed in accordance with McDermott's contract as amended and so holds". Accordingly, and since this was a consolidated proceeding, the judgment of the district court in this regard will be vacated and remanded for further proceedings not inconsistent herewith.
 
 B. The Deficiency Judgment
 
 78
 The issue as to a deficiency judgment against The Fish Meal Company and Harvey Smith, in personam, remains in the case. As a matter of judicial economy and for the guidance of the trial court at the retrial of this case, we now consider that question.
 
 
 79
 The district court granted a deficiency judgment in favor of McDermott and against Fish Meal and Harvey W. Smith in personam for $3,233,891.36, with 6% interest per annum from August 9, 1966, plus attorneys fees and court costs, to be reduced by the sum of $666,747.25, the net amount realized from the Marshal's sale of the eight boats.
 
 
 80
 McDermott contends that this was proper under the provisions of the Ship Mortgage Act of 1920, 46 U.S.C. § 954 (a):
 
 
 81
 "§ 954. Suits in personam in admiralty on default
 
 
 82
 "(a) Upon the default of any term or condition of a preferred mortgage upon a vessel, the mortgagee may, in addition to all other remedies granted by this chapter, bring suit in personam in admiralty in a district court of the United States, against the mortgagor for the amount of the outstanding mortgage indebtedness secured by such vessel or any deficiency in the full payment thereof." [Italics by the Court.]
 
 
 83
 When McDermott foreclosed its preferred ship mortgages and procured a sale of the vessels it did not first have them appraised as provided by the Revised Statutes of Louisiana, 13:4106, 4107:
 
 
 84
 "§ 4106. Deficiency judgment prohibited if sale made without appraisement
 
 
 85
 "If a mortgagee or other creditor takes advantage of a waiver of appraisement of his property, movable, immovable, or both, by a debtor, and the proceeds of the judicial sale thereof are insufficient to satisfy the debt for which the property was sold, the debt nevertheless shall stand fully satisfied and discharged insofar as it constitutes a personal obligation of the debtor. [Italics by the Court]. The mortgagee or other creditor shall not have a right thereafter to proceed against the debtor or any of his other property for such deficiency, except as provided in the next paragraph.
 
 
 86
 "If a mortgage or pledge affects two or more properties, movable, immovable, or both, the judicial sale of any property so affected without appraisement shall not prevent the enforcement of the mortgage or pledge in rem against any other property affected thereby."
 
 
 87
 "§ 4107. R.S. 13:4106 declares a public policy and the provisions thereof cannot, and shall not be waived by a debtor, but it shall only apply to mortgages, contracts, debts or other obligations made, or arising on or after August 1, 1934."
 
 
 88
 Prior to the enactment of the Ship Mortgage Act of 1920, the admiralty had no jurisdiction of a suit to foreclose a mortgage on a ship. The Act, however, granted unto admiralty exclusive jurisdiction to enforce the lien of a preferred ship mortgage. There can now be no suit to foreclose such a mortgage in a state court, Detroit Trust Company, Trustee, v. The Thomas Barlum, 1934, 293 U.S. 21, 32, 33, 42, 55 S.Ct. 31, 79 L.Ed. 176.
 
 
 89
 That these vessels were covered by preferred ship mortgages is not disputed. That the district court, sitting in admiralty, had exclusive jurisdiction over the foreclosures is not to be doubted.
 
 
 90
 Fish Meal and Harvey W. Smith say that because the mortgages provided for waiver of appraisal and the vessels were sold without an appraisal no deficiency arose because La.R.S. 13:4104, 4105, 4106, 4107, expressly declares that "if a mortgagee takes advantage of a waiver of appraisement and the proceeds of the judicial sale thereof are insufficient to satisfy the debt for which the property was sold, the debt nevertheless shall stand fully satisfied and discharged insofar as it constitutes a personal obligation of the debtor".
 
 
 91
 In other words, McDermott preferred to follow a course which caused the debt to be extinguished by operation of law and ipso facto it could not provide the basis for a deficiency.
 
 
 92
 The Ship Mortgage Act is now a half century old but we find no previous case on the specific issue here involved. The parties have cited none.
 
 
 93
 We begin by saying that provisions of the Ship Mortgage Act are paramount and if a conflict exists between it and a state statute the federal statute would of course prevail.
 
 
 94
 Is there a conflict?
 
 
 95
 The difficulty is that "the Mortgage Act is not a comprehensive statute * * * it contains sketchy provisions on foreclosure; * * * the Mortgage Act suggests no answer to many important questions * * * there is no Federal Law of mortgages, decisional or statutory, with the exception of the Mortgage Act itself". Gilmore and Black, The Law of Admiralty 9-57, pp. 590, 591. The federal decisions, sparse as they are, agree that there is no federal law of mortgages, Bergren v. Davis and The Oil Screw called Acadia (D. Conn., 1968) 287 F.Supp. 52, 55, citing Southland Financial Corp. v. Oil Screw Mary Evelyn (E.D.La., 1965) 248 F. Supp. 520, 522.
 
 
 96
 In Bergren, supra, in something of a similar controversy, the court noted that "the mortgage was executed in the State of Maine, the vessel's home port is there, and the mortgage was recorded there. Hence the Court will look to the law of Maine."
 
 
 97
 In the case now before us the mortgage was executed in Louisiana, it was recorded in Louisiana, and although the vessels were laid up in Texas the home port [of The Fish Meal Company] was Morgan City, Louisiana.
 
 
 98
 Obviously, Louisiana cannot prohibit the taking of a deficiency judgment in an admiralty court. By the same token the obligations of the parties are to be determined from the mortgages themselves.[1] This is a substantive matter, not a procedural one. The parties are presumed to have known the Louisiana law of mortgages and to have acted accordingly. That law provided that the sale of mortgaged property under a waiver of appraisal (as here) without prior appraisal fully satisfies and discharges the debt insofar as it constitutes a personal obligation of the debtor. The law of Louisiana seems to be clear that the mortgagee may require a waiver and it may, if it wishes, sell under the terms of that waiver, but when it exercises that privilege it surrenders the right to pursue the debtor in personam for the balance due. The debt is extinguished and no deficiency survives. The law applies to sureties as well as to principal obligors, Simmons v. Clark, 1953, La.Ct.App., 64 So.2d 520.
 
 
 99
 We hold that the admiralty court under the terms of the federal statute clearly has the right to grant deficiency judgments, where deficiencies exist. To ascertain the existence or non-existence of a deficiency, the federal law being silent on the subject, we are compelled to look to the mortgage and to state law governing rights of the parties under the mortgage, especially where there is no question as to the place of execution, the place of recordation, and the home port of the vessel involved, Bergren, supra.
 
 
 100
 And this is true although McDermott could not have known whether there would be a deficiency, or the amount of it, until after the sale. All it had to do to protect itself on that subject was to have had a prior appraisal. It is immaterial that the sale was judicial. Judicial sales are expressly named in the statute.
 
 
 101
 Consequently, McDermott is not entitled to a deficiency judgment against Fish Meal or Harvey W. Smith.
 
 
 102
 The judgment in the breach of contract — failure of consideration case is reversed and remanded for a new trial.
 
 
 103
 The judgment of the District Court sitting in admiralty is vacated and remanded.
 
 
 
 Notes:
 
 
 [1]
 Provisions of Louisiana law are incorporated into Louisiana contracts and form a part of the contract as though expressly written therein, Dantoni v. Board of Levee Commissioners (La., 1955) 80 So.2d 81