[Civ. No. 28886. First Dist., Div. Two. May 22, 1972.]

ALLIED PROPERTIES, Plaintiff and Appellant, v.
JOHN A. BLUME & ASSOCIATES, ENGINEERS,
Defendant and Respondent.

## COUNSEL

Steinhart, Goldberg, Feigenbaum & Ladar, Marvin D. Morgenstein and William A. Resneck for Plaintiff and Appellant.

Farella, Braun & Martel, John S. Martel, Jerome I. Braun and Jon F. Hartung for Defendant and Respondent.

## OPINION

**TAYLOR, P. J.**—On this appeal by plaintiff, Allied Properties (hereafter Allied) from a judgment entered on a jury verdict in favor of respondent, John A. Blume & Associates, Engineers (hereafter Blume), the only contentions are that the trial court erred in rejecting an instruction on im-

plied warranty and giving an instruction that Blume's standard of care was to be determined from the testimony of experts.

Viewing the record most strongly in favor of the judgment and verdict, as we must, the following facts appear. Allied is a corporation that has owned the Santa Barbara Biltmore Hotel in Montecito since 1934 and also owns the Coral Casino Beach and Cabana Club across the street. The Santa Barbara Biltmore Hotel (hereafter hotel) is a high-class vacation hotel for affluent people that caters to people in their 60's, with its formal atmosphere and general requirement of coats and ties for meals. In 1962, Robert Odell, Allied's president, after talking to a number of friends and customers, including Coral Casino Club members who had trouble getting slips in Santa Barbara Harbor, decided that a pier[1] for small boats would be a useful addition to the hotel's facilities. Allied first contacted a contractor who recommended Blume as marine engineers. Initially, Odell asked Blume to design pier facilities that could be constructed for about $50,000. By a letter dated May 17, 1962, Blume outlined for $1,000 an engineering feasibility study to determine whether a structurally adequate facility could be built for $50,000.

Blume's senior vice president, Nicoletti, understood that his responsibilities were limited to "engineering feasibility," an engineering term that includes a determination of whether the facility could be built and the size of the principal member and cost. An "economic feasibility study" that would also include the usage, operation, financing and other economic factors would have cost at least $10,000. Blume assumed that Odell already knew he had potential customers for the proposed hotel pier as Odell had initially approached a contractor to build the pier without a design. Nicoletti understood that Odell wanted a facility to use in the season from May to September for small boats[2] and to transfer people by water taxis from large boats to shore and occasional refueling of large boats in calm weather. Blume assumed that Allied was familiar with the site in front of the hotel,[3] the shallow water there,[4] and the local weather conditions and would, therefore, know that the pier would not be usable at all times.

---

[1] A pier, as distinguished from a marina or harbor, is designed for short-term, loosely tied and attended boats; in a protected marina, a boat is rigidly restrained and left unattended for long periods of time.

[2] Nicoletti defined a small boat as ranging from 6 feet or 8 feet to 40 feet.

[3] Without a breakwater, the pier could only be used in good weather. A breakwater was discussed but not seriously considered, as the cost would have been prohibitive.

[4] The depth of the water at the end of the pier was 15 feet; at the floats, 20 feet. Eight feet is a sufficient depth for boats up to 30 feet.

Blume began the feasibility study in the spring of 1962 and completed it in the fall. Blume delayed from June to the end of August at the request of Allied while Allied negotiated a lease with the state.

Blume's engineers' feasibility study indicated that an expenditure of around $150,000 would be required to build a structurally adequate pier. This information was conveyed to Allied and an expenditure in this amount approved by Odell, again without an economic analysis of the project. Blume then prepared a design for the facility that was to be built by a contractor paid by Allied. At the design phase, Blume's responsibility was to design a structurally sound pier that would withstand the exposure of the site.

As part of the structural calculation to determine the strength necessary to withstand wave action, Blume employed an expert oceanographer, Dr. Kent, and his firm, National Marine Consultants, to provide the wave information for the design of the pier.[5] After the receipt of Dr. Kent's letter of January 2, 1963 (quoted in the footnote below),[6] Nicoletti changed the pier design from one 40 foot float in front of the pier to two 60 foot floats on both sides of the pier that could also be used as fixed platforms raised and lowered by electric hoists, if needed. The initial plan had been to open the pier in the 1963 season but the contractor's delay in driving the piles, for which he was penalized, postponed the opening date to the 1964 season. Construction was completed in December 1963, but a storm damaged both of the floats in December 1963. Blume on December 23, 1963, wrote Odell that the floats were not designed for heavy wave action and had to be raised out of the water whenever the sea was too rough for the average yacht.[7] Blume again recommended electric hoists but Odell, in the interest of economy, first insisted on manual ones.

---

[5] The wave studies requested by Blume from Kent were as to "design waves," the strongest waves (the winter storm season ones from the southeast) that the pier would have to withstand.

[6] "With respect to our recent telephone conversation on the feasibility of using a float upon which to debark passengers, it appears more than likely that such a system would be unusable a good bit of the time. I suggest that you consider using a fixed platform of the type now in use at Gaviota pier by the oil industry. This latter system could, as you suggest, be driven and adjusted to any elevation."

[7] Blume's letter of December 23, 1963, stated: "Recommendations regarding use of landing floats. The recent storm damage to the landing floats emphasizes the fact that these floats are not designed for heavy wave action. If future damage is to be prevented, the floats must be raised to deck level during periods when high waves are prevalent. Although the floats can resist the impact of an occasional high wave, continued battering will result in structural damage. Generally speaking, the landing floats should not be in the water at such times when the sea is too rough for safe operation of the average yacht in the vicinity of the pier.

"Operational experience with the pier will probably indicate that the south side

The floats were again discussed at a meeting on March 9, 1964. On March 18, 1964, Blume wrote to Odell as follows: "Length of floats: The landing floats are designed for unlimited use in waves two feet or less in height. The floats can be used safely for short periods in waves three to four feet in height, but extended exposure to these waves will be expected to produce structural damage. The modifications described in a following paragraph will permit the floats to be used as a fixed platform above the waves for emergency landings in heavy weather. Although this will permit use of the floats with waves in excess of four feet, it should be emphasized that this should only be attempted by experienced boatmen with well-built maneuverable boats."[8] The March 18 letter also repeated the recommendation for electric hoists and a steel spreader bar.

In March of 1964, Blume still planned to leave the floats in the water, but subsequent damage indicated that only the fixed platform was operational at the site. Accordingly, on May 12, 1964, Blume wrote to Odell concerning the damage and again recommended the motorized winches and steel spreader bars to permit operation of the float as a platform.

To arrive at a conservative wave height for the purpose of structural design, Blume's chief engineer, Koch, used a generalized Navy Harbor Analog study. From the tables in this statistical study based on weather and navigation reports without on-site observations, applicable to all areas of the world, when adjusted for the hotel pier location, Koch indicated a wave height[9] in excess of 2 feet for approximately 36 percent of the time. Although this figure was used in the structural calculations, Blume did not consider it to be an accurate estimate of actual wave conditions but merely a conservative figure to be used in the structural design of the floats. For this reason and because the figure did not agree with the on-site observations of Blume's employees,[10] the 36 percent

---

is more sheltered from prevailing wave action than the north side and the float on that side will receive more extensive use from small craft. Serious consideration should be given to motorizing the winches on this side. Manual operation, with or without assistance from portable drill motor, could be retained on the north side. Hand operation of the winches at present is awkward because of the distance from the railing to the extreme position of the winch crank handle."

[8] Nicoletti indicated that he considered a 20-foot boat as maneuverable.

[9] A wave is defined as a disturbance in the water when the water crests up; it is formed by the oscillation of water particles that go in a circular motion, while the surface moves in an oscillatory motion. The wave form moves through the water while the particles only go up and down. The height is measured from the crest to the trough, so that a 2-foot wave has a height of 3 to 4 feet.

[10] The daily records maintained by Blume's employees during construction of the pier in June, July and August of 1963, showed only a single day in which the waves were in excess of 1½ feet.

figure was not reported to Odell. Blume accepted the figure as an indication that in the summer, the pier would not be usable about one-third of the time.

Dr. Kent testified that if he had made the same calculations as Koch on the basis of the Navy Analog study, he would have classified the hotel pier as "unprotected" (e.g., the degree of the arc of exposure of more than 120 degrees for 15 nautical miles) and used a maximum "fetch"[11] of 500-2,000 nautical miles, and used different tables than those used by Koch.

Dr. Kent stated that while it was desirable to verify data like that of the Navy study, it was not always practical to do so. Each year is different and only average figures can be obtained. In addition, the figures had to be adjusted by: the refraction factor[12] of the waves as they approach the shore (that decreases wave height); the shoaling effect[13] (that in turn increases it); the different locations of the stations that studies are based on, and the hotel pier site, as well as the sea and swell[14] data.

Koch's figure of 36 percent was actually higher than the total of the sea and swell for the three summer months at Montecito according to Kent's calculations. However, the total of the sea and swell conditions is not accurate, as additional data are required as to when sea and swell occur.

Dr. Kent, however, considered it below the standard of care for Blume's engineers not to have also used in their calculations a more specific report based on on-site observations, in addition to the generalized data in the Navy Analog report. Kent's firm had prepared a specific study in 1960, on the Santa Barbara channel. The report was made for the Army Engineers and not generally available, but the Blume office usually obtained such reports for its files shortly after their issuance. Koch was not aware of the 1960 study.

Dr. Kent stated that there was no firm standard for wave height for unloading passengers from small boats. The "surge" or lateral motion of the water also has to be taken into account, but this is difficult to do as a practical matter. Aside from big ship analysis, surge studies are not done.

---

[11]Fetch is the length of the water surface exposed to wind used to derive wave heights for certain wind velocities.

[12]As waves approach the shore, they are bent by refraction and become more nearly parallel to the shore.

[13]As waves approach the shallow water, the energy is redistributed so that the water of the wave volume is decreased but its height is increased.

[14]"Swell" is the movement of waves that comes from long distance storms.

In Dr. Kent's opinion, the hotel pier as a plaftorm was usable a fair amount of the time by average people using small craft. If only a few people and boats used the hotel pier since 1965, there must be some other reason than the water conditions, as the water at that location was flat a great number of times.

Allied's expert, Dr. Collins, testified that on the basis of the same study as that used by Koch, his own figure showed that at the hotel pier in June, 63.4 percent of the time the waves were higher than 2 feet; in July, 52.1 percent; and August, 40.3 percent. From these, he obtained an average of 49 percent for the three summer months, during which the waves would be over 2 feet in height. Collins considered the hotel pier site unprotected and used a different set of figures than Koch. In Collins' opinion, the area in front of the hotel was usable by small boats[15] 40 to 50 percent of the time in the summer months.

Collins further testified that besides the vertical motion of the waves, the "surge" or horizontal movement of the water was important as it particularly affected small boats. Collins' chart showed that in July at the hotel pier, the surge exceeded 3 feet. Collins noted that Koch made no horizontal motion study for boat motion but only for very large "design waves."

Collins himself, however, did not make a horizontal motion study for the location until the time of trial and had never heard of one being completed for a small boat facility. At the time of trial, his opinion was that reasonable operating criteria for small boats was a surge from 3 to 4 feet. He also believed that surge studies should be made for exposed locations where there was no breakwater.

The pier was first used in the 1964 season but was thereafter used very little. Allied contemplated demolishing the pier, although hotel guests and others enjoy walking on it. There was conflicting evidence as to why the pier was not generally used as a yachting facility; some witnesses indicated that even with the electric hoists, the pier and floats were not usable because of the rough water and surge conditions; others, that the pier had and could be used by small boats. In the opinion of some, the pier was too short and the water too shallow. There was also evidence that there were ample moorings available at the nearby Santa Barbara Yacht Harbor and that the formal atmosphere and clothing requirements of the hotel did not appeal to boating people. In 1966, Allied filed its complaint in this action seeking to recover the approximately $155,000 cost of the pier, plus the

---

[15]Collins defined small boats as under 30 feet.

amounts paid to Blume and other damages allegedly sustained. Allied sought recovery for: 1) Blume's nondisclosure of the 36 percent figure developed by Koch; 2) Koch's failure to consult the 1960 National Marine Consultants study; and 3) Blume's omission of "surge" studies.

■ Allied first contends on appeal that the trial court erred in rejecting its proffered instruction on implied warranty, set forth below.[16] The instruction, based on *Aced* v. *Hobbs-Sesack Plumbing Co.*, 55 Cal.2d 573 [12 Cal.Rptr. 257, 360 P.2d 897], wherein the court held that an implied warranty of merchantability or suitability for use could be a part of a construction contract for labor and materials. The court said at page 582: "Several cases dealing with construction contracts and other contracts for labor and material show that ordinarily such contracts give rise to an implied warranty that the product will be fit for its intended use both as to workmanship and materials. (*Kuitems* v. *Covell*, 104 Cal.App.2d 482, 484-485 [231 P.2d 552]; *Economy Fuse & Mfg. Co.* v. *Raymond Concrete Pile Co.*, 111 F.2d 875, 878-879; *In re Talbott's Estate*, 184 Kan. 501 [337 P.2d 986, 989]; *Mann* v. *Clowser*, 190 Va. 887 [59 S.E.2d 78, 84]; cf. *Jose-Balz Co.* v. *De Witt*, 93 Ind.App. 672 [176 N.E. 864, 865]; *Baerveldt & Honig Construction Co.* v. *Szombathy*, 365 Mo. 845 [289 S.W.2d 116, 120].) These cases support the proposition that although the provisions of the Uniform Sales Act with respect to implied warranty (Civ. Code, §§ 1734-1736) apply only to sales, similar warranties may be implied in other contracts not governed by such statutory provisions when the contracts are of such a nature that the implication is justified."

Allied attempts to argue that in the instant case, Blume impliedly warranted, as part of the contract, that the pier and floats it had designed were reasonably suitable for use by small craft. Apart from the lack of evidentiary basis for the instruction here, the well settled rule in California is that where the primary objective of a transaction is to obtain services, the doctrines of implied warranty and strict liability do not apply (cf. *Carmichael* v. *Reitz*, 17 Cal.App.3d 958 [95 Cal.Rptr. 381]). As originally stated in *Gagne* v. *Bertran*, 43 Cal.2d 481 [275 P.2d 15], former Chief Justice Traynor, in holding there was no strict implied warranty liability on the part of a test hole driller, stated at page 487: "He was not a seller of property who obligated himself as part of his bargain to convey property in the condition represented. The amount of his fee and the fact that he was paid by the hour also indicate that he was

---

[16]"When the defendant agreed to determine the feasibility of the pier and landing floats, and then agreed to design the pier and landing floats, there was an implied warranty that the pier and landing floats would be reasonably suitable for the purpose for which such pier or landing floats are ordinarily used."

selling service and not insurance. Thus the general rule is applicable that those who sell their services for the guidance of others in their economic, financial, and personal affairs are not liable in the absence of negligence or intentional misconduct."

This rule has been consistently followed in this state with respect to professional services (*Roberts* v. *Karr,* 178 Cal.App.2d 535 [3 Cal.Rptr. 98] (surveyor); *Gautier* v. *General Telephone Co.,* 234 Cal.App.2d 302 [44 Cal.Rptr. 404] (communications services); *Bonadiman-McCain, Inc.* v. *Snow,* 183 Cal.App.2d 58 [6 Cal.Rptr. 52] (engineer); *Lindner* v. *Barlow, Davis & Wood,* 210 Cal.App.2d 660 [27 Cal.Rptr. 101] (accountant); *Pancoast* v. *Russell,* 148 Cal.App.2d 909 [307 P.2d 719] (architect)).

As the court further stated in *Gagne, supra,* at pages 489 and 490: "The services of experts are sought because of their special skill. They have a duty to exercise the ordinary skill and competence of members of their profession, and a failure to discharge that duty will subject them to liability for negligence. Those who hire such persons are not justified in expecting infallibility, but can expect only reasonable care and competence. They purchase service, not insurance. [Citations.]"

Allied, however, cites *Hill* v. *Polar Pantries,* 219 S.C. 263 [64 S.E.2d 885, 25 A.L.R.2d 1080], wherein the defendant, the operator of a frozen food plant who furnished plans and specifications for a similar plant to the plaintiff-owner, was held liable. The court quoted from 17 C.J.S., Contracts, section 329, page 781, and said at page 1084 [of 25 A.L.R.2d]: ". . . where 'a person holds himself out as specially qualified to perform work of a particular character, there is an implied warranty that the work which he undertakes shall be of proper workmanship and reasonable fitness for its intended use, and, if a party furnishes specifications and plans for a contractor to follow in a construction job, he thereby impliedly warrants their sufficiency for the purpose in view,'" and held that the evidence supported the judgment as to breach of the implied warranty or the duty to supervise work. *But Polar Pantries reflects a minority view. L. B. Laboratories, Inc.* v. *Mitchell,* 39 Cal.2d 56 [244 P.2d 385], also cited by Allied on implied warranty, is likewise distinguishable as there, the accountant had breached an express contract to file income tax returns on time.

*J. Ray McDermott and Company* v. *Vessel Morning Star* (5th Cir. 1970) 431 F.2d 714, is also not helpful. In *McDermott,* the defendant shipbuilder undertook the construction of eight fishing vessels of pre-

scribed draft and fish hold capacity that subsequently proved to be wholly unsatisfactory for the use intended, as well as unseaworthy. The shipbuilder had employed a naval architect to design the vessels; certain changes were made in the vessels at the request of the owner that interfered with the efficiency and seaworthiness of the vessels. *The architect was not named as a defendant.* The court held that the shipbuilder could not escape his contractual responsibilities by claiming the defect to be in the specifications rather than the construction, that the architect had a duty to warn the owners of the potential negative effect of the changes requested,[17] and that the trial court erred in telling the jury that the unsuitability of the vessels would not indicate that they had not been constructed according to the contract.

Allied further contends that a professional impliedly warrants his design. As indicated above, such a rule would be inconsistent with the general rule that a professional does not impliedly warrant his services. Allied, however, cites *Montrose Contracting Co.* v. *County of Westchester,* 80 F.2d 841, which sets forth the rule that an owner warrants the sufficiency of plans and specifications furnished to a contractor. Although this rule has been accepted in California as to public entity owners (*Souza & McCue Constr. Co.* v. *Superior Court,* 57 Cal.2d 508, 510-511 [20 Cal.Rptr. 634, 370 P.2d 338]), the rationale is that any additional costs caused by an error in the plans and specifications can be more equitably borne by the owner who receives the benefits than by the contractor. This rationale cannot be readily transferred to a professional who prepares plans for an owner and receives hourly compensation for his services.

■ Allied's second contention on appeal is that the trial court erred in instructing the jury that it could determine Blume's standard of professional care only from the opinion of competent experts who testified as to such standards. Allied argues that the instruction applies only to medical malpractice and that in the instant case, any layman could tell whether or not the pier and floats were able to function for the purpose for which they were constructed. Allied provides no authority or rationale for applying the rule only to malpractice cases. In fact, an identical argument was rejected by division one of this court in *Lysick* v. *Walcom,* 258 Cal.App.2d 136, at page 156 [65 Cal.Rptr. 406, 28 A.L.R.3d 368], as to the standard of care required of attorneys. In *Paxton* v. *County of Alameda,* 119 Cal.App.2d 393 [259 P.2d 934], a substantially similar

---

[17]This is not to be equated with the imposition of an implied warranty of the suitability of the product but merely indicates that it is *negligence* for the architect to fail to warn the owner of the negative effect of changes.

instruction was approved as applicable to architects. As indicated above, both of the experts here agreed that there was no applicable standard of wave heights for small boat facilities in the instant situation. None of the cases cited by Allied on this point involve either the professional as a party or the standard of care applicable to a professional; in each case, the professional offered opinion evidence as to causation or the proper standard of care applicable to a nonprofessional (*Neel* v. *Mannings, Inc.,* 19 Cal.2d 647 [122 P.2d 576]; *Southern Pacific Co.* v. *City of Los Angeles,* 5 Cal.2d 545 [55 P.2d 847]; *National A. I. Co.* v. *Industrial Acc. Com.,* 132 Cal.App. 373 [22 P.2d 568]; *Shaver* v. *United Parcel Service,* 90 Cal.App. 764 [266 P. 606]).

Finally, we turn to Allied's contention that the standard of care applicable to a professional need not be based on expert testimony where "general physical misfeasance is in question." The rule, however, as clearly stated in *Lysick, supra,* and other cases, is that the standard of care applicable to a given profession must be determined from the testimony of experts *unless* the conduct involved is within the common knowledge of laymen. The fact that the pier and floats at the hotel were not used very much was a fact within the common knowledge of laymen. There was conflicting evidence as to whether the lack of use was caused by the malfunction of the pier or economic or social factors. The questions for the jury, however, were not simply why the pier was not used and whether the pier and floats functioned properly, but also to determine whether, under the complex circumstances, any negligence of Blume was the cause of the malfunction, if any. The voluminous record indicates that the standard of care and the complex calculations required were exclusively within the knowledge of experts, and that marine engineering is not an exact science. Accordingly, the trial court properly gave the instruction of which Allied complains.

We have carefully examined the entire record and all of the instructions given by the trial court. As there was no error, the judgment entered on the jury verdict in favor of Blume is affirmed.

Kane, J., and Rouse, J., concurred.