HOVEN, by Guardian *ad litem,* and another, Respondents, v. KELBLE, and others, Appellants: BURROUGHS, Defendant.

*No. 75–452. Argued May 31, 1977.—Decided July 1, 1977.*
(Also reported in 256 N. W. 2d 379.)

For the appellants there was a joint brief by *John R. Teetaert* and *Fulton, Menn & Nehs, Ltd.* of Appleton for St. Paul Fire & Marine Ins. Co. and John A. Kelble, M.D.; and *Merten, Connell & Sisolak, S.C.* of Milwaukee, for St. Mary's Hospital and Insurance Company of North America, and oral argument by *Mr. Teetaert.*

For the respondents there were briefs by *James R. Gass, Russell M. Ware* and *Kasdorf, Dall, Lewis & Swietlik,* and oral argument by *Mr. Ware,* all of Milwaukee.

ABRAHAMSON, J. This is a medical malpractice action, instituted by complaint served on April 14, 1975, which is presently before this court on appeals from an order entered on demurrer. In the action Robert Hoven, by guardian *ad litem,* and Diann Hoven, Robert Hoven's wife, seek to recover damages sustained as a result of injuries suffered by Robert Hoven while undergoing a lung biopsy on May 2, 1973. The defendants are St. Mary's Hospital, at which the lung biopsy was performed, Dr. John Burroughs, the surgeon who performed the procedure, and Dr. John A. Kelble, the anesthesiologist. Also named as defendants are the Insurance Company of North America and the St. Paul Fire and Marine Insurance Company, liability insurers for the parties. The complaint alleges that during the lung biopsy Robert Hoven suffered a cardiac arrest and injury to his nervous system and brain tissue resulting in past, present and future medical expenses, pain, suffering, disability, and loss of income, all to his damage in the amount of $3 million. Diann Hoven's damages for past, present and future loss of the society, companionship, consortium and services of Robert Hoven were alleged in the sum of $1 million.

The foregoing allegations constitute what are denominated the "Preliminary Allegations" of the com-

plaint and may be intended to make out a cause of action against the defendants jointly. No demurrer was interposed thereto. The complaint then alleges liability in the defendants individually in ten separately stated causes of action. Four causes of action allege specific acts of negligence and are not directly at issue on this appeal. Of the remaining six causes of action, three separately allege applicability of the doctrine of res ipsa loquitur as to defendants Kelble, Burroughs and St. Mary's Hospital,[1] and three causes of action against the same defendants are predicated on a theory of "strict liability" for allegedly defective medical services rendered by each of the same three defendants.[2] The defendants demurred

---

[1] The plaintiff's cause of action alleging the doctrine of res ipsa loquitur against Kelble reads in pertinent part:

"10. Upon information and belief, that at some time during the anesthesia performed on plaintiff by Kelble the plaintiff, Robert Hoven sustained a cardiac arrest that was caused by some negligence on the part of defendant Kelble and the doctrine of res ipsa loquitur is applicable hereto.

"11. Upon information and belief, that the injuries and damages occasioned by the cardiac arrest are such that would not have occurred without the negligence of someone.

"12. Upon information and belief that the cardiac arrest arose while the plaintiff was under the control of this defendant, Kelble."

This statement of the cause of action against Kelble is representative of those against the other two non-insurer defendants.

[2] The "strict liability" cause of action against Kelble reads as follows:

"29. That Kelble is and was at the time of this occurrence a seller engaged in the business of selling medical services and at all times relevant hereto held himself out as a seller of the specialty medical service of anesthesiology.

"30. That the medical services rendered by Kelble were expected to and did reach the plaintiff without substantial change in the condition when rendered.

"31. That the medical services rendered by Kelble were defective when so rendered.

"32. That the defects in said services were the cause of the plaintiffs' injuries, losses and damages."

separately to the strict liability and res ipsa loquitur causes of action (with the exception that Dr. Burroughs did not demur to the res ipsa loquitur cause of action against him), and a hearing on the demurrers was held on September 15, 1975. The trial court ruled from the bench at the close of the hearing that the demurrers to the res ipsa loquitur causes of action would be overruled and the demurrers to the strict liability causes of action would be sustained. From an order entered accordingly on October 2, 1975, Kelble and the hospital (along with their insurers) have each appealed from that part of the order overruling their demurrers to the res ipsa loquitur claims, and the plaintiffs have appealed from that part of the order sustaining the demurrers to the strict liability causes of action.

These appeals raise two issues:

A. Is a complaint in a medical malpractice action arising out of a surgical procedure demurrable where, in alleging applicability of the doctrine of res ipsa loquitur, control is alleged to have been in each of three defendants, but exclusive control is not alleged to have been in the defendants collectively or in any one of them?

B. Is a so-called "strict liability" cause of action demurrable in a medical malpractice action arising out of a surgical procedure?

*Res Ipsa Loquitur*

In *Szafranski v. Radetzky*, 31 Wis.2d 119, 141 N.W.2d 902 (1966), this court had before it a demurrer to a complaint alleging specific acts of negligence in a first count and purporting to allege res ipsa loquitur in the second

Again, this statement of the cause of action against Kelble is representative of those against the other two non-insurer defendants.

count. The relevance of the doctrine at the pleading
stage was set forth by the court as follows, 31 Wis.2d at
132, 133: .

". . . The doctrine of *res ipsa loquitur* is, of course,
not a rule of pleading but a doctrine from the law of evi-
dence that permits an inference of the defendant's negli-
gence without any direct testimony as to his conduct at
the very time such negligence occurred.

"It is settled in this state that *res ipsa loquitur* may
properly be alleged in a complaint and may be alleged, in
addition or alternatively, although all the allegations of
specific negligence are made. See Ghiardi, Res Ipsa
Loquitur in Wisconsin, 39 Marquette Law Review (1956),
361, 379. However, to use the doctrine of *res ipsa* in
pleading, sufficient facts must be alleged to show that
its use is appropriate. Our court has held that the fol-
lowing elements are required for the application of
*res ipsa. Turk v. H. C. Prange Co.* (1963), 18 Wis.
(2d) 547, 119 N.W. (2d) 365:

"1. The accident does not occur in the absence of
negligence.

"2. The defendant must have exclusive control of
[the] instrumentality.

"These elements have not been alleged in this com-
plaint.

"When the facts developed in the course of trial are
sufficient to raise a *res ipsa* inference, a plaintiff may
rely on that doctrine although he did not plead it. How-
ever, if a complaint based upon *res ipsa* is attacked by
demurrer, it will be sustained only if the essential ele-
ments of *res ipsa* are alleged. (See 3 Am.Jur., Pleading
and Practice Forms, Anno., p. 80, sec. 3:42, for a sample
allegation of *res ipsa loquitur*.)"

Thus the question on demurrer is whether the com-
plaint satisfactorily alleges the elements for the doctrine's
application. It may be noted, however, that at the present
stage of this action, the answer to the question seems
of marginal significance. This is not a case where the

complaint depends completely on res ipsa loquitur, such that if the demurrer is sustained the plaintiffs are out of court. Whatever disposition is made of the res ipsa causes of action, there will remain the first cause of action in negligence against all defendants and the causes of action in negligence against the individual defendants. If the evidence adduced at trial is such as to render the doctrine of res ipsa loquitur applicable, the plaintiffs will be entitled to rely thereon to defeat a motion for a directed verdict, and will be entitled to an appropriate jury instruction, whether the doctrine was pleaded or not.

"Whether *the evidence presented* warrants the giving of a *res ipsa loquitur* instruction always presents a question of law for the trial court to pass on." (Emphasis supplied.) *Fehrman v. Smirl,* 20 Wis.2d 1, 28b, 121 N.W.2d 255 (1963).

Clearly a final determination as to the applicability of res ipsa loquitur could seldom if ever be made at the pleading stage.

The test employed on demurrer was described as follows in *De Bauche v. Knott,* 69 Wis.2d 119, 121, 230 N.W.2d 158 (1975):

" 'On demurrer it is the duty of this court to accept the allegations of the complaint as true. A demurrer to a complaint admits all facts well pleaded, but denies that those facts have the legal consequences asserted by the plaintiff. When this court reviews a trial court's order on demurrer, it is obliged to construe the complaint liberally and to uphold it if it expressly or by reasonable inferences states any cause of action. Sec. 263.07, Stats., sec. 263.27; *Estate of Mayer* (1965), 26 Wis.2d 671, 677, 133 N.W.2d 322.' "

Initially, defendants contend that the plaintiffs have alleged too much by way of specific negligent acts to

be entitled to rely on res ipsa loquitur. This contention is without merit. It is settled in Wisconsin that a plaintiff may plead res ipsa loquitur and specific negligent acts in the alternative. *Szafranski v. Radetzky, supra.* In *Knief v. Sargent,* 40 Wis.2d 4, 9, 161 N.W.2d 232 (1968); *Turtenwald v. Aetna Casualty & Surety Co.,* 55 Wis.2d 659, 667, 668, 201 N.W.2d 1 (1972); and *Utica Mutual Insurance Co. v. Ripon Cooperative,* 50 Wis.2d 431, 439, 440, 184 N.W.2d 65 (1971), we set forth the test for determining when a plaintiff has introduced enough but not too much evidence to permit reliance on res ipsa loquitur. It would be inappropriate to apply this test at the pleading stage, where it is altogether uncertain what the plaintiff ultimately may be able to prove at trial.

The defendants next contend that since the complaint alleges as to each defendant in the alternative that the injuries to Robert Hoven occurred while Hoven was "under the control of" the defendant named, the allegation is defective because it fails to allege that the defendant's control was exclusive.

The usual formula by which this court has stated the conditions for application of res ipsa loquitur is the following:

(1) The event must be a kind which ordinarily does not occur in the absence of someone's negligence, and

(2) It must be caused by an agency or instrumentality within the exclusive control of the defendant. *Turk v. H.C. Prange Co.,* 18 Wis.2d 547, 553, 119 N.W.2d 365 (1963); *Utica Mut. Ins. Co. v. Ripon Cooperative,* 50 Wis.2d 431, 436, 184 N.W.2d 65 (1971); *Trogun v. Fruchtman,* 58 Wis.2d 569, 590, 207 N.W.2d 297 (1973); *Szafranski v. Radetzky, supra.*

When these two conditions are present, they give rise to a permissive inference of negligence on the part of the defendant which the jury is free to accept or reject. It

is settled that the doctrine may be applied in medical malpractice cases and that the likelihood that negligence was the cause may be shown by expert medical testimony in cases where it may not be so inferred on the basis of common knowledge. *Fehrman v. Smirl*, 20 Wis.2d 1, 21, 22, 25, 26, 121 N.W.2d 255, 122 N.W.2d 439 (1963); *Trogun v. Fruchtman, supra.*

Though the requirement of exclusive control in the defendant has been frequently stated by this and other courts, the courts do not give this requirement a strict literal interpretation, and the phrase "exclusive control" is not in all cases an accurate statement of the principle sought to be expressed. Restatement of the Law, *Torts*, 2d, sec. 328D, does not speak in terms of control at all, but requires that "other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence." Prosser, *Law of Torts*, sec. 39, pages 219–221 (4th ed. 1971), discusses the concept of "exclusive control" as follows:

"This element usually is stated as meaning that the defendant must be in 'exclusive control' of the instrumentality which has caused the accident. Such control of course does serve effectively to focus any negligence upon the defendant; but the strict and literal application of the formula has led some courts to ridiculous conclusions, requiring that the defendant be in possession at the time of the plaintiff's injury—as in the Rhode Island case denying recovery where a customer in a store sat down in a chair, which collapsed. Of course this is wrong: it loses sight of the real purpose of the reasoning process in an attempt to reduce it to a fixed, mechanical and rigid rule. 'Control,' if it is not to be pernicious and misleading, must be a very flexible term. It must be enough that the defendant has the right or power of control, and the opportunity to exercise it, as in the case of an owner who is present while another is driving his car, or a landowner who permits visitors to come on his premises. It is enough that he shares the duty and the responsibility, as in the case of the landlord

of a building from which an electric sign falls into the street.

"There are other cases, however, in which it is clear that 'control' is simply the wrong word. The plaintiff who is riding a horse is in exclusive control of it, but when the saddle slips off the inference is still that it is the fault of the defendant who put it on. There is now quite general agreement that the fact that the plaintiff is sitting on the defendant's stool when it collapses, or has possession of an exploding bottle, or a loaf of bread with glass baked inside of it, or is using an appliance, which the defendant has manufactured, will not prevent the application of res ipsa loquitur when the evidence reasonably eliminates other explanations than the defendant's negligence. Some courts have said that it is enough that the defendant was in exclusive control at the time of the indicated negligence. It would be far better, and much confusion would be avoided, if the idea of 'control' were discarded altogether, and we were to say merely that the apparent cause of the accident must be such that the defendant would be responsible for any negligence connected with it."

Wisconsin cases are consistent with Prosser's assessment of "exclusive control." In *Ryan v. Zweck-Wollenberg Co.*, 266 Wis. 630, 639–645, 64 N.W.2d 226 (1954), this court applied res ipsa loquitur in the case of a plaintiff injured by an electric shock from a refrigerator she had owned for several years, the shock apparently having originated from a short circuit within the sealed compressor unit. Drawing an analogy to cases involving bursting beverage bottles, the court found the requirements for the doctrine had been met where the plaintiff had adequately shown that there had not been any intervening acts on the part of persons other than the refrigerator's manufacturer which could have caused the short circuit. The doctrine was applied to a bursting bottle in *Zarling v. La Salle Coca-Cola Bottling Co.*, 2 Wis.2d 596, 600–602, 87 N.W.2d 263

(1958), the court concluding that the plaintiff had satisfactorily negated the possibility that the defective condition of the bottle had been caused by the act of someone who handled the bottle after it left the defendant bottler's possession. The point of requiring control by the defendant is, as indicated by Prosser, to provide the basis for an inference that whatever negligence was involved may properly be charged to the defendant.[3]

In light of the purpose of the requirement of control and the rule that complaints are to be liberally construed, the failure to allege exclusive control should not be deemed a fatal defect in a complaint based on res ipsa loquitur. The requirement of exclusivity or of control is not strictly interpreted even at the proof stage, and it would seem unduly artificial to make the word "exclusive" determinative at the pleading stage.

The res ipsa loquitur "causes of action" are pleaded in the alternative, which the plaintiffs properly could have done.[4] In each allegation the cardiac arrest suffered by Robert Hoven is alleged to have been caused by the negligence of the defendant, the occurrence is alleged to have been such as would not have occurred without the negligence of someone, and it is alleged that Hoven was at the time in the control of the defendant. The allegation of control of Hoven, who is alleged to have been

---

[3] See also 2 Harper & James, The Law of Torts, sec. 19.7, pp. 1085–1092 (1956); Louisell & Williams, Medical Malpractice, sec. 14.04, p. 428 (1973); Ghiardi, Res Ipsa Loquitur in Wisconsin, 39 Marq. L. Rev. 361, 368–372 (1956); Adamson, Medical Malpractice, Misuse of Res Ipsa Loquitur, 46 Minn. L. Rev. 1043 (1962).

[4] Sec. 260.11, Stats., provided in part:

"A plaintiff may join as defendants persons against whom the right to relief is alleged to exist in the alternative, although recovery against one may be inconsistent with recovery against the other. . . ."

under anesthesia at the time, ought reasonably to be construed as a sufficient allegation of control of the instrumentalities responsible for the cardiac arrest. *Cf. Beaudoin v. Watertown Memorial Hospital,* 32 Wis.2d 132, 137, 138, 145 N.W.2d 166 (1966). The intent of the pleading seems to have been to anticipate the possibility that proof may be adduced sufficient to bring negligence home to one of the defendants by showing that at material times that defendant was in control and the others were not. The plaintiffs had a right to so plead. The trial court's order overruling the demurrer to the res ipsa loquitur causes of action is correct, and we affirm.[5]

[5] Plaintiffs have also suggested that their res ipsa loquitur allegations may be sustained on the theory of *Ybarra v. Spangard,* 25 Cal.2d 486, 154 P.2d 687 (1944), which was approved by this court in *Beaudoin v. Watertown Memorial Hospital,* 32 Wis.2d 132, 138, 145 N.W.2d 166 (1966). *Ybarra* is a departure from the concept of exclusive control, founded primarily on the uniquely disadvantageous position of the patient who is negligently injured while under anesthesia. *Ybarra* held that under such circumstances a plaintiff who had shown that his injury probably resulted from the negligence of one of several defendants but had not provided evidence tying the negligence to any particular defendant could nevertheless rely upon res ipsa loquitur. The California court said:

". . . where a plaintiff receives unusual injuries while unconscious and in the course of medical treatment, all those defendants who had any control over his body or the instrumentalities which might have caused the injuries may properly be called upon to meet the inference of negligence by giving an explanation of their conduct." 25 Cal.2d at 494.

*See* Prosser, *Law of Torts,* sec. 39, p. 223. Whether the plaintiffs in the case at bar can rely on *Beaudoin* and *Ybarra* at the trial is a matter which cannot now be determined. At this point, however, the only allegations of control are against individual defendants and are stated in the alternative. Nowhere is it alleged that Robert Hoven was under the collective control of all of these defendants, which would seem to be the appropriate allegation under the *Ybarra Case. See* Comment, *The Application*

*Strict Liability*

Our court has held members of the medical profession to a standard of reasonable care under the circumstances.[6] As we said in *Francois v. Mokrohisky,* 67 Wis.2d 196, 201, 202, 226 N.W.2d 470 (1975) :

" '[A] plaintiff must prove the defendant failed to give him, not the highest degree of care, but merely the reasonable care and skill usually possessed by physicians of the same school . . . .' [*Trogun v. Fruchtman,* 58 Wis.2d 569, 584, 207 N.W.2d 297 (1973).]

"A physician is not an insurer of the results of his diagnosis or procedures. He is obliged to conform to the accepted standard of reasonable care, but he is not liable for failing to exercise an extraordinary degree of care.

"True, physicians too often have attempted to encourage the aurae of an infallibility they do not possess. Theirs is not an exact science, and even the very best of them can be wrong in diagnosis or procedure. The question, however, is not whether a physician has made a mistake; rather, the question is whether he was negligent. Unless the untoward result was caused by the failure to conform to the accepted standard of care, he is not liable in negligence for damages.

---

*of Res Ipsa Loquitur in Suits Against Multiple Defendants,* 34 Albany L. Rev. 106 (1969).

[6] For a discussion of the law of professional malpractice *see* Comment, *Professional Negligence,* 121 U. Pa. L. Rev. 627 (1973).

Malpractice liability has two sanctions for the negligent physician: monetary (the imposition of a money judgment) and social (marking the doctor as "guilty of malpractice"). The monetary impact is altered by the availability of malpractice insurance, and the shifting of insurance costs to the patients. Many view the social sanction as unfair and deleterious to the individual practitioner. Fear of potential lawsuit can alter, for the worse, medical practices. Others view the sanction of stigma as an effective means of deterrence. The strict liability doctrine advocated here apparently would not remove the social stigma.

"Members of the medical profession who have held themselves out to be supermen should not be surprised that laymen take them at their word and impose super-damages. The law, however, recognizes the medical profession for what it is—a class of fallible men, some of whom are unusually well-qualified and expert and some of whom are not. The standard to which they must conform, however, is determined by the practices of neither the very best nor the worst of the class. Like automobile drivers, engineers, common laborers, and lawyers, they are obliged to conform to reasonable care in the circumstances."

This case presents a novel theory for Wisconsin. Plaintiffs attempt to extend the rule of "strict liability" to the defendants for personal injuries occurring during the delivery of medical services.

Plaintiffs' "strict liability" causes of action (reprinted at note 2, *supra*) are modeled after the requirements of *Dippel v. Sciano*, 37 Wis.2d 442, 155 N.W.2d 55 (1967), in which this court adopted in products liability cases the rule of strict liability in tort set forth in Restatement of the Law, *Torts* 2d, sec. 402A. The court described the case a plaintiff must prove as follows:

"From a reading of the plain language of the rule, the plaintiff must prove (1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it." *Dippel v. Sciano*, 37 Wis.2d at 460.

Application of this standard of liability to the rendition of medical services of course would require that

some definition of a "defective" medical service be formulated. Plaintiff's briefs suggest that a suitable and acceptable governing principle is the "reasonable expectations of the consumer," as described by Greenfield in *Consumer Protection in Service Transactions—Implied Warranties and Strict Liability in Tort,* 1974 Utah L. Rev. 661.

Greenfield attacks the goods/services distinction and advocates strict liability for both. He asserts that the measure of a defective service should be the reasonable expectation of the consumer, breaking service transactions into three parts and applying the test to each: (1) analysis to ascertain the cause of the problem; (2) selection or fabrication of a solution; and (3) application of the solution. The basic idea of Greenfield's test is possibility—unless attainment of the solution or goal is impossible, expecting it to be attained is reasonable, and nonattainment results in liability. *Id.* at 698. The author illustrates the operation of his theory by the following discussion of its application to the medical profession:

"With respect to the first component of services, analysis of the problem to ascertain its cause, a doctor would not be liable for erroneously diagnosing a patient's ailment if the cause of the ailment is incapable of being ascertained under the present state of knowledge in the profession. If, however, the disease is capable of correct diagnosis, even though it is extremely rare and typically overlooked or misdiagnosed, then the doctor would be strictly liable. If the cause *can* be determined, then the consumer's expectation that it *will* be determined is reasonable. As a practical matter, the rarer the disease, the less frequently the doctor will be exposed to the risk of misdiagnosing it. The more common the disease, the likelier it is that the doctor will have been negligent in failing to diagnose it correctly, in which event he is liable under present law. So, on the one hand, the increase in the liability of the doctor would not seem to be

substantial, and, on the other hand, those patients injured by the doctor's error would receive compensation.

"Applied to the second component of services, selection of solution to the problem, the doctrine of strict liability would impose liability for injuries caused by the selection of a wrong course of treatment. The injury could take the form either of a deterioration of the patient's health or of a failure to cure him. There may be some resistance to the idea that a doctor is liable for mere failure to cure. If, however, the physician fails to select a known treatment for a particular illness, there is no reason why strict liability should not apply. The existence of a known cure for the ailment makes reasonable the consumer's expectation that it will be selected and applied in his case, and the doctor's failure to select the proper treatment is a defect in the services. On the other hand, if there is no known cure for the ailment, or if the cure is not generally available to members of the profession, the doctor would not be held liable for his selection of a treatment that fails to cure it. The consumer, however, may reasonably expect that a course of treatment selected and administered by a person in the business of providing relief from physical ailments will effect a cure in his particular case. Therefore, the physician's nonliability when there is no known or generally available treatment should be subject to the requirement that the doctor fully inform the patient that there is no known cure and that the proposed course of treatment may not actually provide a cure. In the absence of this disclosure, the doctor's services should be viewed as defective, even though there is no known cure.

"With respect to the third component of services, application of the solution, the doctrine of strict liability would impose liability on a doctor who, for example, erroneously injects into a muscle a drug that is supposed to be injected into subcutaneous tissue. Strict liability is especially appropriate for mechanical tasks, which are typically so easily done correctly." *Id.* at 699, 700.

At oral argument plaintiffs' counsel appeared to advocate a somewhat more restricted test than Greenfield's.

Nevertheless, the essence of plaintiffs' position appears to be that if a plaintiff could show that a hypothetical virtually perfectly informed doctor, working in a perfectly equipped hospital, could have avoided the untoward result, the plaintiff could recover, notwithstanding that the defendants exercised reasonable care in all respects. If attainment of the goal, or avoidance of the maloccurrence is possible, then failure to attain the goal or to avoid the maloccurrence renders the service defective.

This court has stated in respect to products that the doctrine of strict liability does not make the seller an insurer. *Howes v. Deere & Co.,* 71 Wis.2d 268, 273, 238 N.W.2d 76 (1976) ; *Dippel v. Sciano, supra,* 37 Wis.2d at 459, 460. Plaintiffs in the case at bar recognize this and deny that the theory they advocate would have any such effect. Under plaintiffs' theory if there is no known cure the plaintiffs would not recover. However, it is apparent that adoption of the plaintiffs' theory of liability, which we have discussed above, would set the standard of performance for the entire medical profession at the zenith of that profession's achievement, a level at which by definition virtually no one could perform all the time. That which might possibly have been done would be required, or liability would result, and inevitably, the matter would be judged with the acuity of vision which hindsight provides.

In *Schuster v. St. Vincent Hospital,* 45 Wis.2d 135, 143, 172 N.W.2d 421 (1969), a plaintiff who had been unsuccessful in proving negligence against the hospital argued that a higher standard of care than "ordinary care" should be imposed upon a hospital in favor of a patient with respect to the hospital's custodial functions. This court declined, stating simply that "the public policy factors governing negligence actions will best be served by requiring the standard of ordinary care."

Moreover, in several cases this court has rejected the "rarity of result" standard in res ipsa loquitur medical malpractice cases. Mere rarity of an untoward result does not permit an inference that the result was due to negligence; there must be evidence from which it may be inferred that the result does not normally occur in the absence of negligence. *McManus v. Donlin*, 23 Wis.2d 289, 301, 127 N.W.2d 22 (1964); *Shurpit v. Brah*, 30 Wis.2d 388, 403, 141 N.W.2d 266 (1966); *Trogun v. Fruchtman*, 58 Wis.2d 569, 592, 207 N.W.2d 297 (1973). While these cases do not deal expressly with strict liability, they do reflect this court's general reluctance to increase the liability to which hospitals and doctors are exposed by an across-the-board change in the standard of care of the type advocated here.

To date this court has not applied the *Dippel* test of strict liability beyond the context of damages resulting from the sale of a defective and unreasonably dangerous product.[7] Other courts have, however, extended the doctrine of strict liability to transactions which did not involve a sale of goods but which were found analogous to the sale of goods. For example, the doctrine has been extended to chattel lease transactions[8] and to the sale or use of buildings.[9] A number of decisions in other juris-

---

[7] The *Dippel* rule of liability was extended to a manufacturer of a defective component part in *City of Franklin v. Badger Ford Truck Sales*, 58 Wis.2d 641, 649, 650, 207 N.W.2d 866 (1973), and was held to be available to a bystander who had not purchased or used the faulty product in *Howes v. Hansen*, 56 Wis.2d 247, 254–260, 201 N.W.2d 825 (1972). The injury need not be a physical injury to the plaintiff's person, but may be a purely economic injury. *La Crosse v. Schubert, Schroeder & Asso.*, 72 Wis.2d 38, 240 N.W.2d 124 (1976).

[8] Comment, *Strict Liability of the Bailor, Lessor & Licensor*, 57 Marq. L. Rev. 111 (1973); Brook, *Sales-Service Hybrid Transactions: A Policy Approach*, 28 Sw. L.J. 575, 595–597 (1974).

[9] *See* Love, *Landlord's Liability for Defective Premises: Caveat Lessee, Negligence, or Strict Liability?*, 1975 Wis. L. Rev. 19,

dictions have allowed recovery on the basis of strict liability (or the closely related doctrine of implied warranty) where the injury was due to a defective product supplied or used in the course of rendering a service to the plaintiff.[10] Several cases have allowed recovery on

137–138, 143; Ursin, *Strict Liability for Defective Business Premises—One Step Beyond Rowland & Greenman*, 22 U.C.L.A. L. Rev. 820 (1975).

[10] *See, e.g., Newmark v. Gimbels, Inc.*, 54 N.J. 585, 258 A.2d 697 (1969), where a beauty parlor's owner was held strictly liable in tort for injuries to the scalp of a customer resulting from application of apparently defective permanent wave lotion.

A number of cases have arisen in respect to the liability of hospitals and blood banks for transmission to patients of serum hepatitis through transfusion of blood carrying the virus which produces the disease. In *Koenig v. Milwaukee Blood Center, Inc.*, 23 Wis.2d 324, 127 N.W.2d 50 (1964), this court, relying on the leading case of *Perlmutter v. Beth David Hospital*, 308 N.Y. 100, 123 N.E.2d 792 (1954), held that the collection and distribution of blood was a service rather than a sale of goods, and that therefore no implied warranty existed. *Perlmutter* has been much criticized, not so much for its holding that strict liability does not exist for contaminated blood as for its reliance on a sales/service distinction, which was artificial enough when applied to a hospital but even more so where, as in *Koenig*, it is extended to apply to the blood bank. Blood is a product which is furnished in connection with professional services. A narrow definition of what is a sale and a classification of the activity as a service is not helpful in analyzing the problem. *See Cunningham v. MacNeal Memorial Hospital*, 47 Ill.2d 443, 266 N.E.2d 897 (1970) and *Reilly v. King County Central Blood Bank, Inc.*, 6 Wash. App. 172, 492 P.2d 246 (1971), rejecting *Perlmutter* and holding that strict liability applied. *Cf. Hoffman v. Misericordia Hospital of Phil.*, 439 Pa. 501, 267 A.2d 867 (1970).

The real basis of these "blood" decisions appears to be the fact that it is impossible to determine whether the hepatitis virus exists in blood coupled with the fact that the use of blood for transfusions is often essential to medical treatment. In *Brody v. Overlook Hospital*, 127 N.J. Super. 331, 317 A.2d 392 (1974), aff'd, 66 N.J. 448, 332 A.2d 596, the court rejected the sale/service distinction as the basis for decision but reached the same result on the theory that the inability to test for hepatitis rendered the

the basis of strict liability or implied warranty where "defective services" have been rendered, but these services have been of a relatively routine or simple nature.[11] Where "professional" services are in issue the cases uniformly require that negligence be shown.[12] We

blood an "unavoidably unsafe product" which was therefore not *unreasonably* dangerous as required by sec. 402A of the Restatement.

The legislatures of Wisconsin and many other states have enacted statutes to preclude application of warranty or strict tort liability in contaminated blood cases. Sec. 146.31(2), Stats.

*See* Note, *Products and The Professional: Strict Liability in the Sale-Service Hybrid Transaction,* 24 Hastings L.J. 111 (1972); Brook, *Sales-Service Hybrid Transactions; A Policy Approach,* 28 Sw. L.J. 575 (1974); Farnsworth, *Implied Warranties of Quality in Non-Sales Cases,* 57 Colum. L. Rev. 653 (1957).

[11] *See Hill v. Polar Pantries,* 219 S.C. 263, 64 S.E.2d 885 (1951); *Buckeye Union Fire Ins. Co. v. Detroit Edison Co.,* 38 Mich. App. 325, 196 N.W.2d 316 (1972); *Broyles v. Brown Engineering Co.,* 275 Ala. 35, 151 So.2d 767 (1963).

[12] *See La Rossa v. Scientific Design Co.,* 402 F.2d 937 (3d Cir. (1968)), where the court concluded that neither implied warranty nor strict liability should apply to professional services. The court denied recovery on either theory to a plaintiff injured by inhalation of vanadium dust while installing a chemical plant. The action was against the firm which designed and engineered the plant and supervised its construction.

Strict liability for allegedly defective engineering services was also denied in *Allied Properties v. John A. Blume & Assoc.,* 25 Cal. App.3d 848, 102 Cal. Rptr. 259 (1972) (design of a pier and landing floats by a marine engineer) and *Stuart v. Crestview Mut. Water Co.,* 34 Cal. App.3d 802, 110 Cal. Rptr. 543 (1973) (design of a water distribution system which provided inadequate water to permit homeowners to protect their property from fire). *See also Hoover v. Montgomery Ward & Co.,* 528 P.2d 76 (Ore. 1974) (defendant's installation of wheel not subject to strict liability in tort); *Barbee v. Rogers & Rogers,* 425 S.W.2d 342 (Tex. 1968) (strict liability inapplicable in suit against optometrist for fitting of contact lenses); *Magrine v. Krasnica,* 94 N.J. Super. 228, 227 A.2d 539 (Law Div. 1967), aff'd *sub. nom Magrine v. Spector,* 100 N.J. Super. 223, 241 A.2d 637 (App. Div. 1968), aff'd 53 N.J. 259, 250 A.2d 129 (1969) (plaintiff

have found no decision of any court applying strict liability to the rendition of professional medical services.

The plaintiffs rely on *Johnson v. Sears Roebuck & Co.,* 355 F.Supp. 1065 (E.D. Wis. 1973). In *Johnson* Judge Reynolds recognized that this court had not yet decided the applicability of strict liability to services and concluded that the question would not be governed by sales/

could not recover against his dentist on a strict liability theory for injuries suffered when a hypodermic needle being used to inject a local anesthetic snapped off, due to no fault of the dentist, while in the plaintiff's jaw); *Magner v. Beth Israel Hospital,* 120 N.J. Super. 529, 295 A.2d 363 (1972) (permitting plaintiff to recover on the doctrine of *res ipsa loquitur.* against plastic surgeon for burning plaintiff while using an electric needle igniting alcohol still present around the plaintiff's head and neck, but stating without elaboration that neither implied warranty nor strict liability applied to the medical and dental professions).

Professor Kalven comments on the present expansion of products liability from its historic connection with warranty and the consumer to a broader doctrine, no longer associated with a *product* but with an enterprise.

"The idea of enterprise liability has been in the wind for years, originally in an effort to explain the doctrines of agency. On this view what is important is that the defendant is an enterprise, that is, *systematically* engaged in generating the risks, *and* has access to the mechanism of *the market.* The first characteristic is thought to make him a good target for the deterrence of the tort sanction, liability is imposed in the quest for safety and accident prevention; the second characteristic is thought to make him a superior risk-bearer able to pass on the loss into channels of wide distribution. There is undoubted power in these policy notions and this is not the place to debate them seriously. We would merely note that the premises now have considerable reach, and if we are serious about enterprise liability, a good part of contemporary tort law will need to be revised accordingly, and very little of its once spacious domain is likely to be left to the negligence principle." Kalven, *Tort Law-Tort Watch,* 34 J. of Am. Trial Lawyers, 1, 57 (1972).

*See Symposium, Products Liability: Economic Analysis and The Law,* 38 U. of Chi. L. Rev. 1 (1970).

service technicalities. He began by categorizing services provided by hospitals into (1) "professional medical services," and (2) "those mechanical and administrative services" which support the medical services, and continued:

"It is argued, since strict tort liability should not apply to professional medical services by doctors (if that is true, and I believe it is without deciding so at this time), that it follows that strict liability should not apply to mechanical and administrative services by hospitals. I do not think this follows. Medical sciences are not exact. A patient cannot consider a doctor's treatment to be defective simply because it does not cure his ailment. All that a doctor can be expected to provide is adequate treatment commensurate with the state of medical science. In other words, doctors do not contract with patients to provide cures but rather to provide treatment in a non-negligent manner. To hold medical professionals strictly liable under these circumstances would not promote any social benefit. In fact, if that standard were applied to doctors, it might make them reluctant to assume responsibility for the treatment of patients, particularly when such treatment involves a developing area of medicine, which would work a serious social disservice.

"I do not, however, feel that the mechanical and administrative services provided by hospitals should necessarily be exempt from strict liability. Several considerations lead me to this conclusion. They are: first, the serious consequences which can result when a patient receives defective hospital services; second, the near total inability of laymen to recognize or control such defective service; and, finally, since doctors already are hampered by an inexact science, it is essential that they receive all pertinent information accurately to determine if a particular course of treatment is appropriate. In short, it is in the public interest that those services which hospitals perform for both doctors and patients be performed properly.

" . . .

"Hospitals provide numerous services, and the distinction between professional and nonprofessional ser-

vices is often vague. Therefore, the decision to impose strict liability should be made on an *ad hoc* basis. In each case the decision should be based on the facts, but a conclusion that it is in the public interest to hold a hospital strictly liable for supplying a particular defective service cannot be ruled out as a matter of law."

Thus, Judge Reynolds would permit strict liability only as to certain mechanical or administrative hospital functions; he states his belief, although he does not so hold, that strict liability should not apply to professional medical services rendered by hospitals and physicians for the reasons he sets forth in his opinion.[13]

Plaintiffs' reliance on *Johnson* is misplaced. Nothing in the plaintiffs' complaint can be construed to allege administrative or mechanical negligence by the hospital,

---

[13] This professional—administrative, mechanical distinction was criticized by one commentator as follows:

"Although the *Johnson* decision represents a praiseworthy attempt to overcome the technical sales-service distinction, the court's reasoning is based on an equally technical and perhaps even more confusing foundation. In differentiating between 'professional medical' and 'mechanical and administrative' services, the court resurrects a distinction which proved so difficult to apply that it was criticized and abandoned by the court in which it originated. The court in *Johnson* thus employed a test which it recognized as 'often vague' in an attempt to provide the flexibility required to reach a strict liability holding while avoiding the prevailing policy in both courts and legislatures of protecting the medical field.

"It is submitted that the instant court's distinction between professional and administrative services can have few far-reaching beneficial effects. One obvious problem is that by limiting the strict liability exception to the professional services of physicians, the court ignores the closely analogous professional services of nurses and technicians. More importantly, the distinction only serves to obscure the issues in the broad policy debate now under way concerning the manner in which the law should view the role of hospitals in society." (notes omitted)

*Recent Development, Torts—Strict Liability—Hospitals May be Strictly Liable for Administrative Services,* 41 Tenn. L. Rev. 392, 399, 400 (1974).

or by Burroughs or Kelble. All acts complained of are allegedly defective professional medical services related to causing or permitting, diagnosing and treating Robert Hoven's cardiac arrest. Thus, *Johnson* tends to refute, not support the position of the plaintiffs here.

Two other decisions on which plaintiffs rely can also be distinguished from the case at bar. *Newmark v. Gimbels, Inc.*, 54 N.J. 585, 258 A.2d 697 (1969), which applied strict liability to services rendered by a beauty parlor operator in applying permanent wave solution to a customer, differentiated the services involved in that case from the services of a doctor or a dentist. The court concluded that the policy considerations favoring strict liability applied with diminished force in the context of professional services and were outweighed by the need for free availability of the essential services the medical profession supplies. Again in *Broyles v. Brown Engineering Co.*, 275 Ala. 35, 151 So.2d 767 (1963), the court discussed why implied warranties of a particular result, while imposed in that case on defendants submitting defective drainage plans, are not imposed upon doctors, lawyers and architects, among others.

The usual reasons given for applying strict liability in tort to transactions in goods are the following:[14]

1. It is the seller who in the first instance creates the risk by placing the defective product on the market, and it is the seller, as opposed to the consumer, who has the superior knowledge and opportunity to control the risk.

---

[14] For a further discussion *see* Love, *supra*, note 9, at 134–136; Ursin, *supra*, note 9, at 829–837; Greenfield, *Consumer Protection in Service Transactions—Implied Warranties & Strict Liability in Tort*, 1974 Utah L. Rev. 661, 688–696; Note, *Liability of Design Professionals—The Necessity of Fault*, 58 Iowa L. Rev. 1221, 1244–1248 (1973); *Greiten v. La Dow*, 70 Wis.2d 589, 604 (1975); *Dippel v. Sciano*, 37 Wis.2d 443, 450, 451, 460, 155 N.W.2d 55 (1967).

2. The consumer relies on the skill, care and reputation of the seller and on the apparent safety of the product. The seller generally stimulates this reliance through advertising and other promotion of the goods.

3. The seller is in a better position than the consumer to bear the loss caused by defects and to distribute the costs of the risks created by the sale of the defective product over all his customers. The seller may pass the cost on to consumers as a group in the form of increased prices and may protect himself by purchasing insurance or by a form of self-insurance.

4. The burden of proof on a purchaser of goods may be unreasonably difficult if the consumer must trace a particular item through the distribution and production systems to the source of the defect and prove that the defect resulted from negligence.

5. Strict liability promotes the public interest in the protection of human life, health and safety. Strict liability is an effective deterrent; it deters the creation of unnecessary risks, or to put it positively, strict liability is an incentive to safety.

The plaintifs argue that the mere fact that a transaction involves a "service" rather than a sale of goods does not render these considerations inapplicable or preclude application of strict liability, and we might well agree. Moreover, it may be admitted that many of the justifications for strict liability have force regarding professional medical services.

The provider of medical services appears to stand in substantially the same position with respect to the patient as the seller of goods does with the consumer. The typical purchaser of medicl services cannot evaluate the quality of care offered because medical services are complex and infrequently bought. The medical care market gives the purchaser little assistance in enabling the purchaser to evaluate what he or she is buying. It is gen-

erally the physician—not the patient—who determines the kind of services to be rendered and how often. It is the physician not the patient who prescribes other goods and services, *e.g.*, drugs, therapy, and hospitalization, that should supplement the physician's services. The physician is in a better position than the patient to determine and improve the quality of the services, and the patient's reliance on the doctor's skill, care and reputation is perhaps greater than the reliance of the consumer of goods.[15] The difficulties faced by plaintiffs in carrying the burden of proving negligence on the part of a doctor are well known. *See* Prosser, *Law of Torts*, sec. 39, p. 223 (4th ed. 1971). The hospital and doctor are in a better position than the patient to bear and distribute the risk of loss.[16]

However, other considerations call for caution in moving in the direction the plaintiffs advocate. There are differences between the rendition of medical services and transactions in goods (or perhaps other types of services as well). Medical and many other professional services tend often to be experimental in nature, dependent on factors beyond the control of the professional, and devoid of certainty or assurance of results. Medical services are an absolute necessity to society, and they must be readily available to the people. It is said that strict

---

[15] Although physicians do hold themselves out as experts deserving of reliance, they do not advertise, and it has been suggested that this factor is significant. In *Brody v. Overlook Hospital*, 121 N.J. Super. 299, 296 A.2d 668 (1972), it was said that strict liability is better suited to mass-produced product which is placed in the stream of commerce and promoted to the public through commercial advertising than to the limited and necessitous professional relationship that exists in medical transactions.

[16] Malpractice insurance is already costly, however, and the increased costs of insurance, if any, if strict liability were imposed, are unknown. The availability of insurance is one factor justifying the imposition of strict liability.

liability will inevitably increase the cost for medical services, which might make them beyond the means of many consumers, and that imposition of strict liability might hamper progress in developing new medicines and medical techniques. [17]

It is true that concepts of tort liability have expanded in recent years. To name just two examples, in *Dippel v. Sciano* we adopted strict product liability, and in *Kojis v. Doctors Hospital*, 12 Wis.2d 367, 107 N.W.2d 131, 107 N.W.2d 292 (1961), we overruled long-established precedent to abrogate the tort immunity charitable hospitals had formerly enjoyed.

"It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." [18]

However, before a change in the law is made, a court, if it is to act responsibly, must be able to foresee with reasonable clarity the results of its decision and to say with reasonable certainty that the change will serve the best interests of society.

---

[17] ". . . These arguments, however, are not fully persuasive. First, the production and sale of food and drugs, which are as essential as medical services, are subject to strict liability doctrine. Secondly, special treatment for doctors because of the essential nature of their services can be justified only if the imposition of strict liability would either make doctors unwilling to provide the same range of services they now provide or cause such an increase in the cost of medical services that people now seeking medical services would be deterred from seeking them. Neither assumption has been demonstrated to be true, and it is doubtful whether either assumption has proven true with respect to essential (or even nonessential) goods." Greenfield, *supra* note 14, at p. 687.

[18] *Funk v. United States*, 290 U.S. 371, 383, 54 S.Ct. 212, 78 L.Ed. 369 (1933), quoted by this court in *Dippel v. Sciano, supra,* 37 Wis.2d at 457.

Strict product liability was the next logical increment in a predictable process of evolution.[19] The abolition of charitable immunity was preceded by a whittling away at the doctrine, and when it finally occurred, the effect was the predictable one of placing charitable hospitals on the same footing as noncharitable hospitals had always been.

There have been many studies of the delivery of health care in this country and of the problems of the malpractice concept of tort liability. Although there may be general dissatisfaction with our present tort medical injury compensation system, moving from the malpractice concept—even with its many problems—to a strict liability system at the present time appears to be a dubious move. Strict liability has been far from a panacea in products cases, and there has been reluctance to advocate the extension of the principle to medical services. Several commentators have proposed "no-fault liability" in lieu of negligence or strict-liability concepts. The ability of the judicial system to create a scheme of strict liability or no-fault liability rules for medical accidents has been questioned. Because of the unknown costs and the inability to assess the results, commentators have shied away from advocating the adoption of full programs of strict liability or no-fault liability in the medical service area and have suggested that the legislature and private groups establish experimental and elective techniques to deal with injuries occurring from medical services.[20]

[19] The evolution of product liability is described in Prosser, *Law of Torts, supra,* ch. 17; Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer),* 69 Yale L.J. 1099 (1960).

[20] For a discussion of the doctrine of strict liability or no-fault liability in consumer services, including medical services, *see:* Epstein, *Medical Malpractice: The Case for Contract,* 1 Am. B. F. Res. J. 87 (1976); O'Connell, *It's Time for No Fault for All Kinds of Injuries,* 60 A.B.A.J. 1070 (1974); Havighurst &

The *Report of the Secretary's* [*Dep't of Health, Education & Welfare*] *Commission on Medical Malpractice,* p. 100 (1973), concluded that it could not recommend adoption of an untested system which may cause even more severe problems than exist under medical malpractice.

We have no doubt that concepts of tort liability will continue to change and that service industries including the medical profession may be affected by such change. However, at this time the consequences of the step the plaintiffs urge cannot be predicted with sufficient clarity to permit that step to be taken.

*By the Court.*—Order affirmed.

Tancredi, *"Medical Adversity Insurance"—A No-Fault Approach to Medical Malpractice & Quality Assurance,* 1974 The Ins. L.J. 69; O'Connell, *Expanding No-Fault Automobile Insurance: Some Proposals,* 59 Va. L. Rev. 749 (1973); Keeton, *Compensation for Medical Accidents,* 121 U. of Pa. L. Rev. 590 (1972); Ehrenzweig, *Compulsory "Hospital-Accident" Insurance: A Needed First Step Toward the Displacement of Liability for "Medical Malpractice,"* 31 U. of Chi. L. Rev. 279 (1963); Note, *Comparative Approaches to Liability for Medical Maloccurrences,* 84 Yale L.J. 1141 (1975); Comment, *Congress Takes a Look at No-Fault Proposal for Medical Malpractice: Some Observations,* 9 Akron L. Rev. 116 (1975); Note, *Continuing the Common Law Response to the New Industrial State: The Extension of Enterprise Liability to Consumer Services,* 22 U.C.L.A. L. Rev. 400 (1974).