**Alyce L. LA ROSSA, Administratrix Ad Prosequendum of Vito William La Rossa, and Alyce L. La Rossa, General Administratrix of the Goods, Chattels, Rights, and Credits of the Estate of Vito William La Rossa, Appellants,**

v.

**SCIENTIFIC DESIGN COMPANY, Inc.**

**No. 16705.**

United States Court of Appeals
Third Circuit.

Argued March 21, 1968.

Decided Oct. 3, 1968.

Rehearing Denied Dec. 4, 1968.

cise of the broad discretionary powers granted to the district court under Admiralty Rule 50." 349 F.2d at 529–530.

938

Herbert E. Greenstone, Greenstone & Greenstone, Newark, N.J., for appellants.

Joseph Barry, Stavis, Richardson, Koenigsberg & Rossmoore, Newark, N.J. (William Rossmoore, Newark, N.J., on the brief), for appellee.

Before McLAUGHLIN, FORMAN and FREEDMAN, Circuit Judges.

OPINION OF THE COURT

FREEDMAN, Circuit Judge.

This is a wrongful death and survival action [1] invoking the diversity of citizenship jurisdiction of the District Court of New Jersey. It presents for our decision important and difficult questions of New Jersey law.

Plaintiff's decedent was an employee of Witco Chemical Company, a manufacturer of chemical products. Defendant, Scientific Design Company, Inc., contracted with Witco to design, engineer and supervise the construction and

---

1. Plaintiff brought the survival claim in her capacity of general administratrix, N.J.S.A. 2A :15–3, and the wrongful death claim as administratrix ad prosequendum. N.J.S.A. 2A :31–2.

initial operation of a new Witco plant for the manufacture of phthalic anhydride. One of the final steps in setting up the plant consisted of loading a catalyst in the form of pellets into a reactor. The loading was performed by employees of Witco, including decedent. Scientific Design supplied the pellets under the contract and was responsible for the supervision of the loading operation.[2] The pellets were manufactured by a subsidiary of Scientific Design and their exact chemical formula was a trade secret, but some executives of Witco were aware that vanadium was the active chemical agent in the coating of the pellets.

The loading operation generated dust from the vanadium coating and some of the men working on the operation, although supplied with dust respirator masks, suffered symptoms of a toxic reaction to the dust. About a month after his initial exposure to the dust decedent was found to have a growth in his throat which proved to be cancerous and ultimately caused his death. Plaintiff claims that the alleged carcinogenic properties of the vanadium dust either activated a latent condition or actually caused the cancer itself. Liability was asserted on two separate grounds. One was that Scientific Design was negligent in failing to provide adequate safety precautions and supervision in the loading of the vanadium pellets into the reactor. The other was that express and implied warranties that the process of installation would be safe arose from Scientific Design's contract with Witco and ran in favor of decedent.

At the close of a protracted jury trial the district court granted a motion to dismiss the counts on express and implied warranty but submitted to the jury the negligence counts, requiring it to determine whether Scientific Design was guilty of negligence and if so, whether such negligence was the proximate cause of decedent's cancerous condition and resulting death. The jury returned a verdict in favor of the defendant. Plaintiff appeals from the judgment, claiming that the trial court erred in granting defendant's motion to dismiss the warranty counts.

In the trial court plaintiff claimed that the loading process itself was unsafe rather than that the pellets were defective. She now argues that the pellets were defective because they were unreasonably dangerous. This claim was not pressed in the district court and is not supported by the record. In fact, at trial plaintiff's counsel expressly disavowed any claim that the pellets were defective and plaintiff's position rested on the claim that the decedent would have suffered no ill effects if the catalyst had been loaded under proper safeguards.

■ We turn first, then, to plaintiff's claim based on breach of express warranty. For this plaintiff relies on a number of provisions of the contract between Scientific Design and Witco. These provisions, which are set out below,[3] embody in substance Scientific De-

---

**2.** This responsibility was not expressly stated in the contract but was explicitly acknowledged in the Manual of Operating Instructions supplied by Scientific Design. The contract called for technical supervision of the initial operation of the plant. Scientific Design does not contest plaintiff's claim that the Manual made explicit a duty inherent in the contract to supervise the loading.

**3.** These paragraphs state:
"2.01. SD [Scientific Design] agrees to perform in a good and workmanlike manner complete design and engineering services, home office preparation and placement of purchase orders as WIT-CO's agent, expediting, inspection in vendor's shops as required in SD's judgment, and technical supervision of initial operation of the plant. SD's obligation to furnish technical supervision of the initial operation of the Plant shall terminate on a date not later than three (3) months after the Date of Start-Up.

"2.02. SD agrees to perform in a good and workmanlike manner the erection and construction of the Plant.

"2.05. SD agrees to obtain for the benefit of WITCO vendors' guarantees as follows: 'All materials which may be furnished by Seller pursuant to this order shall be guaranteed to be of the best

sign's promise to perform its services in a workmanlike manner and to construct a plant suitable for its intended purpose. The promises as to performance, therefore, are limited to "good and workmanlike" execution and this indicates only the exercise of due care or the absence of negligence. It does not support an interpretation which would absolutely require safe performance under whatever circumstances might arise. On the claim of express warranty arising from the contract between Scientific Design and Witco there is, therefore, no basis for liability without proof of negligence.

Plaintiff's main argument, however, is that Scientific Design should be held liable on an implied warranty because in undertaking to perform services for Witco it impliedly warranted that it would insure the safety of all those who might be affected. We must, therefore, determine the extent of the development in New Jersey of the doctrine of strict liability which has grown out of the expanded principle of implied warranty in products liability cases and its applicability to the facts in this case. Our judgment necessarily must be speculative for there is no New Jersey decision expressly ruling a case such as this, which does not present the usual situation of a product mass produced for consumer use but instead involves professional engineering, design and construction services performed under contract for a large manufacturer.

New Jersey stands in the forefront of those states which have abandoned the need to stand in privity of contract and eliminated any requirement of proof of negligence in cases where a consumer has suffered injury in the use of a mass produced article. The New Jersey Supreme Court led the way in Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960), which held that the wife of the purchaser of a defective automobile was entitled to recover damages for personal injury from the dealer and the manufacturer although there was no showing of negligence and there was no privity of contract, and despite attempted limitations on the express warranties contained in the contract of sale. "In the field of products liability," says Professor Prosser, "the date of the fall of the citadel of privity * * *" is the date Henningsen was decided. [4]

"What has followed [Henningsen]", we quote Prosser again, "has been the most rapid and altogether spectacular overturn of an established rule in the entire history of the law of torts." [5] In Henningsen the principle on which liability was made to rest was that an implied warranty existed which ran in favor of the wife of the purchaser of the automobile since she must have been within the anticipation of the parties when the automobile was sold to her husband.[6] In Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305, 16 A.L.R.3d 670 (1965), the court in effect allowed the device of implied warranty to wither by recognizing that a manufacturer's liability is essentially one of strict liability in tort. The new doctrine was explicitly attributed to important considerations of public policy. The court said:

"In this developing field of the law, courts have necessarily been proceeding step by step in their search for a stable principle which can stand on its

quality of their respective kinds (unless otherwise authorized by Buyer) to be free from faulty design (to the extent that such design is not furnished by Buyer) workmanship or material, to be usable and efficient for the purpose for which ordered, and to be of sufficient size and capacity and of proper materials so as to fulfill in all respects such operating conditions, if any as are specified by Buyer."

4. Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn.L. Rev. 791 (1966).

5. Ibid. at 793–94.

6. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 414–415, 161 A.2d 69, 100, 75 A.L.R.2d 1 (1960).

own base as a permanent part of the substantive law. The quest has found sound expression, we believe, in the doctrine of strict liability in tort. Such doctrine stems from the reality of the relationship between manufacturers of products and the consuming public to whom the products are offered for sale. As we indicated in *Henningsen*, the great mass of the purchasing public has neither adequate knowledge nor sufficient opportunity to determine if articles bought or used are defective. Obviously they must rely upon the skill, care and reputation of the maker. * * * It must be said, therefore, that when the manufacturer presents his goods to the public for sale he accompanies them with a representation that they are suitable and safe for the intended use. * * * The obligation of the manufacturer thus becomes what in justice it ought to be—an enterprise liability, and one which should not depend on the intricacies of the law of sales." [7]

Although the doctrine of strict tort liability of a manufacturer without proof of negligence has thus been recognized in New Jersey,[8] it still bears the imprint of its origin in contractual warranty.[9] In recent years the New Jersey cases have held the manufacturer liable, either under implied warranty [10] or strict liability in tort, for direct property loss,[11] as well as personal injury, and they also have extended liability to include implied warranty of fitness not only in sales of goods, but also in sales of real property [12] and bailments for hire.[13] The difference in the two concepts at times requires different treatment in elements other than liability, such as damages and contractual waiver.[14] Such distinctions, however, do not enter into the present case and we, therefore, need only consider the basic premise of liability.

In all the cases decided by the New Jersey courts there existed a defect in the product which caused the injury to the ultimate consumer. Even when described as strict liability in tort the underlying principle has been analogized to the sale of goods. For example, in Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314 (1965), an infant child was permitted to recover from the builder of mass produced homes for injuries caused by a defective heating system in a home which her parents had leased from the purchaser. The decision was

7. Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 64–65, 207 A.2d 305, 311–312 (1965). See also Greenman v. Yuba Power Products. Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049 (1962), Traynor, J.

8. Santor v. A & M Karagheusian, Inc., supra; Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434, 450–451, 212 A.2d 769, 777–778 (1965). See Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn.L.Rev. 791 (1966); Restatement (Second) of Torts, § 402A.

9. New Jersey formerly recognized the concept as embodied in the Uniform Sales Act, N.J.S.A. 46:30–21, and has now adopted the Uniform Commercial Code, which codifies the doctrine of implied warranty in sales of goods, N.J.S.A. 12A: 2–314, 315.

10. A very recent decision of the Appellate Division of the New Jersey Superior Court has planted on implied warranty the liability of a beauty parlor operator for injury to a patron resulting from a defective lotion applied in a permanent wave. Newmark v. Gimbels, Inc., 102 N.J.Super. 279, 246 A.2d 11 (App.Div. 1968).

11. Santor v. A & M Karagheusian, Inc., supra.

12. Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314 (1965).

13. Cintrone v. Hertz Truck Leasing & Rental Service, supra. See also Delaney v. Towmotor Corp., 339 F.2d 4 (2 Cir. 1964), Friendly, J., sustaining liability on "manufacturer's strict liability" without the necessity of showing negligence.

14. The *Santor* case has been criticized for failing to take proper account of these differences. See 79 Harv.L.Rev. 1315 (1966). See also Donnelly, After the Fall of the Citadel—Victory or Consideration of All Interests?, 19 Syracuse L.Rev. 1 (1967).

founded on the absence of any rational distinction between the obligation of the builder of mass produced homes and the manufacturer of other mass produced consumer products. In Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434, 212 A.2d 769 (1965), the lessor of a defective truck was held liable to the lessee's driver-employee on the theory of implied warranty. Here, too, the court pointed out that the lease transaction served essentially the same business ends as a sale. Indeed, it has been suggested that whatever the label given to the modern rule, the analogy to sales cases should form the limit of liability.[15]

Whatever may be the ultimate limit of the rule of strict liability in tort in New Jersey there lies at the foundation of the decided cases a defect in the product which caused injury to the innocent user.

The disparity in position and bargaining power which forces the consumer to depend entirely on the manufacturer and the difficulty of requiring the injured party in consumer products cases to trace back along the channel of trade to the source of production in the search for the origin of the defect in order to prove negligence have been among the reasons for the emergence of the doctrine of strict liability in tort. An additional element has been the recognition that the mass producer of a product made for consumer use should as a matter of public policy bear the responsibility of an insurer against a defect in the product which causes harm to the consumer.

Professional services do not ordinarily lend themselves to the doctrine of tort liability without fault because they lack the elements which gave rise to the doctrine. There is no mass production of goods or a large body of distant consumers whom it would be unfair to require to trace the article they used along the channels of trade to the original manufacturer and there to pinpoint an act of negligence remote from their knowledge and even from their ability to inquire.[16] Thus, professional services form a marked contrast to consumer

15. See Farnsworth, Implied Warranties in Non-Sales Cases, 57 Columbia L.Rev. 653 (1957). In Newmark v. Gimbel's, Inc., 102 N.J.Super. 279, 246 A.2d 11 (1968), a beauty parlor was held chargeable for injury to plaintiff's scalp as a result of a permanent wave in which a lotion manufactured by another was used. The Superior Court held that the issue of breach of implied warranty should have been submitted to the jury in addition to the issue of negligence which the jury had decided in favor of the defendant. The trial court had refused to submit the implied warranty issue to the jury on the ground that the application of a permanent wave by the beauty parlor amounted to the rendition of a service rather than the sale of a product and that no implied warranty of reasonable fitness existed. The Superior Court reasoned that the lotion was used up in the process of giving plaintiff the permanent wave and, therefore, resembled any other sale for consumer use and so was distinguishable from Magrine v. Krasnica, 94 N.J.Super. 228, 227 A.2d 539 (Cty.Ct.), aff'd sub nom., Magrine v. Spector, 100 N.J.Super. 223, 241 A.2d 637 (App.Div.1967), where a dentist was held not liable for injury caused by a defective hypodermic needle which he used in his professional treatment of his patient. Although articulating its decision in terms of implied warranty and not absolute liability in tort, the court in Newman apparently agreed with Professor Farnsworth's view.

16. The New Jersey Supreme Court has recognized that the element of mass production is important in determining whether to attach strict liability to construction work. See Schipper v. Levitt & Sons, Inc., supra. In the recent case of Totten v. Gruzen, 52 N.J. 202, 245 A.2d 1 (1968), the court overthrew the long established "completed and accepted" rule in New Jersey under which one not party to a contract was barred from suing the contractor or architect for negligence in the performance of his contract, once the work had been accepted by the owner. Liability, however, was based solely on the claim of negligence and the court noting this said: "Since there is no claim in the instant case on the theory of strict liabilty in tort, we do not reach the question whether that doctrine as applied in Schipper with respect to mass developers should be equally applicable in other building situations."

products cases and even in those jurisdictions which have adopted a rule of strict products liability a majority of decisions have declined to apply it to professional services.[17] The reason for the distinction is succinctly stated by Traynor, J., in Gagne v. Bertran, 43 Cal. 2d 481, 275 P.2d 15, 20–21 (1954): "[T]he general rule is applicable that those who sell their services for the guidance of others in their economic, financial, and personal affairs are not liable in the absence of negligence or intentional misconduct. * * * Those who hire [experts] * * * are not justified in expecting infallibility, but can expect only reasonable care and competence. They purchase service, not insurance."

■■ In the present case Scientific Design's services were highly specialized and affected only the small group of employees of Witco engaged on the job. The effect of defendant's performance in supplying the pellets and supervising their installation had no element of impact on the public at large. Instead of being one of numerous public consumers of defendant's product, decedent was one of a small group of employees of Witco affected by Scientific Design's activity.[18] Witco, as decedent's employer, is a more appropriate insurer against harm to the decedent than was the defendant which was exercising a supervisory authority delegated to it by Witco.[19]

If the activity of Scientific Design pursuant to its contract with Witco be viewed as the rendering of professional services, then no matter how the basis of liability is described it amounts to no more than a claim of negligence in failing to perform these services with due care. If the process of loading the vanadium coated pellets into the reactor exposed the workmen to danger, again the basis of liability rests on the failure to act with due care. There is nothing in Scientific Design's conduct from which one can say on the basis of the New Jersey decisions relating to the supply of a consumer product that an implied warranty ran from Scientific Design to the decedent or that the facts support the application of the principle of absolute liability in tort for a defect in a mass produced product supplied to a consumer. In the absence of such circumstances plaintiff's claim is reduced essentially to an allegation that Scientific Design failed to surround the workmen who were loading the pellets into the reactor with adequate protection. This is a claim of negligence which is concluded by the jury's verdict for the defendant on the negligence counts, either because the jury found no lack of due care or no causation.

The judgment of the district court will be affirmed.

17. See e.g., Pepsi Cola Bottling Co. v. Superior Burner Service Co., 427 P.2d 833 (Alaska 1967); Audlane Lumber & Builders Supply, Inc. v. D. E. Britt Associates, Inc., 168 So.2d 333 (Fla.1964); Gagne v. Bertran, 43 Cal.2d 481, 275 P. 2d 15 (1954). A New Jersey lower court recognized the distinction between a supplier of goods and a supplier of professional services. See Magrine v. Krasnica, supra.

18. Compare, Lonzrick v. Republic Steel Corp., 1 Ohio App.2d 374, 205 N.E.2d 92 (Ct.App.1965).

19. In fact, although the contract required Scientific Design to supervise the installation of the pellets and the initial operation of the plant, what actually happened was that Witco through its own employees loaded the pellets into the reactor and supervised the workmen.