RACINE COUNTY, Plaintiff-Appellant,

v.

ORACULAR MILWAUKEE, INC., Oracular, Inc.,
Oracular of Minnesota, LLC and Oracular of
Michigan, Inc., Defendants-Respondents.†

Court of Appeals

*No. 2007AP2861. Oral argument October 21, 2008.*
*—Decided April 8, 2009.*

2009 WI App 58

(Also reported in 767 N.W.2d 280.)

† Petition to review granted 8/17/09.

790

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of and oral argument by *Timothy S. Knurr* of *Schoone, Leuck, Kelley, Pitts & Knurr, S.C.*, Racine.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Jeffrey P. Aiken* and *Eric J. Meier* of *Whyte Hirschboeck Dudek S.C.*, Milwaukee. There was oral argument by *Eric J. Meier*.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. ANDERSON, P.J. Racine County appeals from the circuit court's decision that its contract with Oracular Milwaukee, Inc., was a contract for "professional services"; to recover, the County had to prove professional negligence; and expert testimony was required "as a matter of law." We reverse, because Oracular does not possess the indicia of a "professional"; the contract between the parties was a simple contract for "services"; and expert testimony is not required when a party's conduct is within the realm of the ordinary experience of the average juror.

## BACKGROUND

¶ 2. In November 2003, Racine County issued a Request for Proposal (RFP) to provide assistance in upgrading its "current Peoplesoft World system to Peoplesoft One 8.0 and install the same release of Peoplesoft One Human Resources and Payroll modules." Oracular Milwaukee submitted a proposal that the County ultimately accepted and the parties entered into a Consulting Service Agreement on February 2, 2004, that incorporated, by reference, the County's RFP and Oracular's proposal.

¶ 3. In the RFP, the County stated that "[c]ompletion of this project will result in a fully operational system tailored to the needs of Racine County." The County required both that a project manager be named and that included in the duties was the development of "a strategy to guide Racine County through the complete upgrade and implementation of the software, training and providing the technical resources necessary to successfully complete the project."

¶ 4. The RFP listed specific requirements for training:

793

**[V. B.] 2. Training:** The Project Manager will:

a. Identify, recommend and coordinate Racine County's training needs.

b. Specify the type–

i. Formal JDE training

ii. Internal workshops

iii. Web training

c. Assist in the proper training of the County's project team to gain the necessary understanding of the capabilities of the software.

d. Assist in understanding the software's rich functionality to better identify and establish accurate and realistic goals and objectives.

e. Provide effective communication and debriefing of the instructor(s) allowing the Project Manager to assist Racine County to refine the scope of business process analysis.

In its proposal, Oracular responded to the training requirements, "[a]ll core training will be conducted internally and delivered by the project consulting staff. Training is to include guidance to key users on set-up or end-user procedure and training manuals."

¶ 5. Vendors responding to the RFP were required to

[s]ubmit a proposed GANT[T] Chart[1] schedule listing all procedures including training for each phase of the

---

[1] A GANTT Chart is "a graphic device that depicts tasks, machines, personnel, or whatever resources are required to accomplish a job on a calendar-oriented grid. Charts may be provided for various managerial levels and responsibilities, but detailed planning occurs at the lowest organizational level.

project. Identify the task name, duration (no. of days), start date, finish date and party responsible for each task.

¶ 6.   The RFP reminded vendors that time was of the essence. In its proposal, Oracular promised that "[w]e will combine the talents of our consulting organization with the talents of the Racine County staff in order *to complete this project on time and on budget.*" (Emphasis added.) Oracular's Preliminary Project Plan included a specific proposal for a completion date, "a combined Go-Live date of September 1, 2004." The February 2, 2004 Consulting Service Agreement changed the Go-Live date to September 7, 2004, to conform to a GANTT Chart attached as Addendum A to Oracular's proposal.

¶ 7.   For reasons we will visit later, the County terminated the contract with Oracular on February 16, 2006, and brought this lawsuit on February 15, 2008. The County pleads two causes of action against Oracular; first, a breach of the consulting service agreement, and second, a violation of WIS. STAT. § 100.18 (2007–08).[2] Oracular filed an answer and counterclaims; it alleged a breach of contract, quantum meruit and promissory estoppel.

¶ 8.   Subsequently, Oracular brought a motion for summary judgment. In a supporting brief it argued:

> Because the Agreement calls for software programming and training services, the U.C.C. and its remedy

Performance may be monitored and controlled throughout the organization." The Free Dictionary, http://encyclopedia2. thefreedictionary.com/Gantt+chart (last visited Jan. 29, 2009).

[2] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

and warranty provisions do not apply. Similarly, there are no implied warranties of results under Wisconsin law. Consequently, Oracular has not breached the Agreement as a matter of law, it is entitled to retain the payments previously received, and it is entitled to dismissal of the County's breach of contract claim in its entirety.

Relying upon *Hoven v. Kelble*, 79 Wis. 2d 444, 463, 256 N.W.2d 379 (1977), and *Micro-Managers, Inc. v. Gregory*, 147 Wis. 2d 500, 513, 434 N.W.2d 97 (Ct. App. 1988), Oracular argued that the agreement was a professional services contract and the County could not carry the day because it had not disclosed any expert witnesses on the standard of care owed by computer consultants.

¶ 9.  The County responded that it had never asserted that the U.C.C. and its remedy and warranty provisions applied to this case. It pointed out that *Hoven* was a medical malpractice case and the language Oracular cited was in a portion of the decision discussing the application of a strict liability theory to medical services. The County contended that requiring expert testimony is an extraordinary step, to be taken only when the jury is facing unusually complex or esoteric issues. As an example, the County stated that the agreement required the software to convert data and it would present fact witnesses who would testify that, when Oracular abandoned the project, the software did not convert data. It suggests that whether or not the County got what it contracted for is not beyond the realm of experience of the ordinary juror.

¶ 10.  In granting Oracular's summary judgment motion, the circuit court said it was persuaded that under *Micro-Managers,* the Agreement was a contract

for professional services and the County had to prove negligence in order to recover. It said:

> If that's the case, I believe the defense is correct here, you need an expert opinion as a matter of law. This is not something that an ordinary person off the street would have any way of knowing one way or another. It demands a level of expertise that is beyond what normally people would know.
>
> . . . .
>
> [W]e're talking about using computers, and it's to the inth degree when we're talking about developing the underlying language, the underlying programming. It's incredibly esoteric. It's incredibly knowledge intensive, and without an expert telling us that Oracular didn't live up to the standard of care required in this consulting contract, I think that the claim fails.

¶ 11.  The County immediately brought a motion for reconsideration, arguing that the circuit court erred when it held that, because this was a contract for services to install computer software, expert testimony was required as a matter of law. It pointed to several cases holding that in lawsuits involving professional services, expert testimony is only required if the issues are outside the common knowledge and ordinary experience of an average juror. The County put forward that the average juror could determine if Oracular breached the agreement by not providing competent trainers or failing to meet the Go-Live date of September 7, 2004.

¶ 12.  The circuit court denied the County's reconsideration motion:

> What it boils down to is how you view this claim. If you think it's simply a breach of contract, that it was time was of the essence at the end of the time frame the

product was not there and it's a breach of contract and they're liable, that's one thing. If you're looking at it, however, in the context as Hoven and Micromanagers did, that this is a professional services contract involving complex computer programming, then we need the negligence or we need the expert testimony with regard to whether or not the consultant failed to live up to the standard of care that a computer consultant is required to live up to in providing the services.

¶ 13.   The County appeals.

STANDARD OF REVIEW

¶ 14.   We review summary judgment decisions de novo, using the same well-known methodology as the circuit court. *See Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶¶ 20–23, 241 Wis. 2d 804, 623 N.W.2d 751. We will uphold the circuit court's summary judgment decision when the prevailing party is entitled to judgment as a matter of law and where no genuine issue of material fact exists. *Id.*, ¶ 24.

¶ 15.   The circuit court held that the County's failure to retain expert witnesses was the equivalent of a failure of proof and granted summary judgment to Oracular. "Whether expert testimony is necessary in a given situation is a question of law, which we decide without deference to the trial court's opinion." *Grace v. Grace*, 195 Wis. 2d 153, 159, 536 N.W.2d 109 (Ct. App. 1995).

DISCUSSION

¶ 16.   Because the circuit court relied upon *Hoven* and *Micro-Managers* to conclude the Consulting Service Agreement was a professional services contract

798

and, as a matter of law, expert testimony on the standard of care was required, we will examine those cases in some detail. *Hoven* was a medical malpractice case in which the supreme court addressed several issues; of interest to us is the discussion on whether the theory of "strict liability" could be applied to medical services. *Hoven*, 79 Wis. 2d at 446–47. After stating the standard of care in medical malpractice cases, the supreme court explained Hoven was attempting to apply the requirements of product liability cases to medical malpractice cases. *Id.* at 456–57. The court then discussed the difference between "goods" and "services." *Id.* at 458–72.

¶ 17. It is during this discussion that the court noted the theory of "strict liability" is routinely applied to damages arising from the sale of "goods." *Id.* at 461. It went on to point out that in some jurisdictions the theory of strict liability has been extended to the sale of quasi-goods, *e.g.*, chattel leases or buildings. *Id.* The court discussed several other applications of the theory before commenting:

> Several cases have allowed recovery on the basis of strict liability or implied warranty where "defective services" have been rendered, but these services have been of a relatively routine or simple nature. Where "professional" services are in issue the cases uniformly require that negligence be shown. We have found no decision of any court applying strict liability to the rendition of professional medical services.

*Id.* at 462–64.

¶ 18. We now turn our attention to *Micro-Managers*. Micro-Managers was a company that designed and developed software. *Micro-Managers*, 147 Wis. 2d at 504. It entered into a contract with Gregory to design the software that would operate a program-

mable controller being used by a third party. *Id.* Micro-Managers started an action to collect the balance due under the contract after Gregory claimed the custom designed software had not been completed to his satisfaction and refused to pay the balance due. *Id.* at 503–05.

¶ 19. The first question we confronted was whether this was a contract for "goods" or "services." *Id.* at 507–09. In concluding that it was a contract for "services," we cited to a case from Indiana that concluded a contract for custom computer programming was a "services" contract. *Id.* at 507–08. We also took into consideration that Micro-Managers billed Gregory on a time and materials basis and concluded that it was a "services" contract. *Id.* at 508–09.

¶ 20. We then moved on to consider whether there was an implied warranty in fact or law. *Id.* at 511. We quickly upheld the circuit court's determination that there was no implied warranty in fact. *Id.* at 512. Then we turned to whether there was an implied warranty in law. *Id.* Relying exclusively on *Hoven* and *La Rossa v. Scientific Design Co.*, 402 F.2d 937 (3d cir. 1968), we refused to recognize the existence of an implied warranty as a matter of law where professional services are rendered. *Micro-Managers*, 147 Wis. 2d at 513. It was this discussion that the circuit court relied upon to hold that the agreement between the County and Oracular was a professional services contract.

¶ 21. *Micro-Managers* cited to a case featured prominently in *Hoven*, 79 Wis. 2d at 462 n.12:

> See *La Rossa v. Scientific Design Co.*, 402 F.2d 937 (3d Cir. (1968)), where the court concluded that neither implied warranty nor strict liability should apply to professional services. The court denied recovery on either theory to a plaintiff injured by inhalation of

vanadium dust while installing a chemical plant. The action was against the firm which designed and engineered the plant and supervised its construction.

In *La Rossa*, the Third Circuit took the time to explain why the theory of "strict liability" does not fit well with professional services contracts. *La Rossa*, 402 F.2d at 942–43.

¶ 22. The circuit court was wrong to place its reliance on *Micro-Managers*. First, the contract between the County and Oracular was not for custom designed software; rather, it was for the installation of "off-the-shelf" software called PeopleSoft One 8.0 along with the same release of PeopleSoft One Human Resources and Payroll modules. Further, the contract in *Micro-Managers* did not require that training in the use of the software be provided; in this case, Oracular contracted with the County to provide training.

¶ 23. Second, whether computer software developers are professionals appears not to have been argued or decided in *Micro-Managers*; we assumed without deciding that they were professionals. Here, we quizzed counsel during oral argument on the question of whether computer consultants should be considered professionals and will answer that question before tackling the circuit court's conclusion that the agreement between the County and Oracular was a professional services contract and required expert testimony on the standard of care as a matter of law.

DEFINITION OF A PROFESSIONAL

¶ 24. Initially, we conclude that whether or not Oracular, a computer consulting company, and its employees, are professionals begs the question. This is because the need to label a person a professional is part

801

and parcel of a "professional malpractice" action. A plaintiff who is injured by a professional's *malpractice* wants to be made whole. But the case at bar is not a malpractice action; it is a contract action. The County wants the benefit of the bargain; it does not seek to be "made whole." Thus, the first problem with the circuit court's decision is that by cloaking Oracular's computer consultants with the professional tag, it adds to the County's burden in pursuing the benefit of the bargain. We wonder if the professional moniker is a proper component of a breach of contract action.

¶ 25.  Second, assuming that terming someone to be a professional and thereby subject to professional standards of care is as relevant in a breach of contract action as whether a person with a particular skill, trade or degree is a professional, subject to the heightened standard of care applied in "professional negligence" cases, is a question of first impression in Wisconsin. We have found convincing explanations from well-respected treatises and persuasive on-point authority from other jurisdictions that convince us that computer consultants are not professionals as that term is used in the tort of professional negligence.

¶ 26.  The circuit court held that because computers are complex—"[i]t's incredibly esoteric"—Oracular was a professional. All the same, "[s]imply because an activity is technically complex and important to the business community does not mean that greater potential liability must attach." *Chatlos Sys., Inc. v. National Cash Register Corp.*, 479 F. Supp. 738, 740 n.1 (D. N.J. 1979).

¶ 27.  Professor Raymond T. Nimmer explains in his treatise covering computer technology and the law:

> Most practitioners in computer consulting, design, and programming do not fit a model that creates

malpractice liability. These businesses and "professional" parties clearly engage in complex and technically sophisticated activities. Computer programmers commonly define themselves as "professionals." Yet, despite the complexity of the work, computer programming and consultation lack the indicia associated with professional status for purposes of imposing higher standards of reasonable care. While programming requires significant skill and effective consultation requires substantial business and technical knowledge, the ability to practice either calling is not restricted or regulated at present by state licensing laws . . . . Unlike traditional professions, while practitioner associations exist, there is no substantial self-regulation or standardization of training within the programming or consulting professions.

RAYMOND T. NIMMER, THE LAW OF COMPUTER TECHNOLOGY § 9.30 at 9–11 (3d ed., Thomson/West 2008).

¶ 28. If complexity of the subject matter does not make a "profession," what does? That question was answered in *Hospital Computer Systems, Inc. v. Staten Island Hospital*, 788 F. Supp. 1351, 1361 (D. N.J. 1992), where a federal district judge, using State of New York law, held that the State of New York would not recognize a cause of action for professional negligence of a computer consultant. Relying on *Lincoln Rochester Trust Co. v. Freeman*, 311 N.E.2d 480 (N.Y. 1974),[3] the federal court held that a profession is identified by (1) a requirement of extensive formal training and learning; (2) admission to practice by a licensing body; (3) a code of ethics imposing standards qualitatively and exten-

[3] The Court of Appeals of New York held that the law is a profession and not a business and therefore the bar association minimum fee schedule does not come within the state's antitrust law's prohibition of business arrangements restraining competition.

sively beyond those that prevail or are tolerated in the marketplace; (4) a system of discipline for violating the code of ethics; (5) a duty to subordinate financial gain to social responsibility; and (6) an obligation of all members to conduct themselves as members of a learned, disciplined and honorable occupation, even in nonprofessional matters. *Hospital Computer Sys., Inc.*, 788 F. Supp. at 1361. The Federal District Judge explained:

> Professionals may be sued for malpractice because the higher standards for care imposed on them by their profession and by state licensing requirements engenders trust in them by clients that is not the norm of the marketplace. When no such higher code of ethics binds a person, such trust is unwarranted. Hence, no duties independent of those created by contract or under ordinary tort principles are imposed on them.

*Id.*

¶ 29. Other jurisdictions have reached the same result. In *Columbus McKinnon Corp. v. China Semiconductor Co., Ltd.*, 867 F. Supp. 1173 (W.D. NY 1994), the court held, "[t]here is no basis in law for extending the doctrine of professional malpractice to cover independent computer consultants." *Id.* at 1182. The court explained, "[t]o lift the theory of malpractice from its narrow origin of personal, professional services to a lay patient or client and apply it to the law of commercial contracts would obfuscate the necessary boundaries of these two areas of law."[4] *Id.* at 1182–83. In *Arthur D. Little International, Inc. v. Dooyang Corp.*, 928 F. Supp.

---

[4] The Wisconsin Supreme Court has discussed the public policy differences between tort law and contract law in *Mackenzie v. Miller Brewing Co.*, 2001 WI 23, 241 Wis. 2d 700, 623 N.W.2d 739:

1189, 1202–03 (D. Mass. 1996), the court dismissed Dooyang's negligence count, in its counterclaim against its business consultant, citing to *Columbus McKinnon*. The Court of Appeals of New York observed that the term "professional" is commonly understood to refer to the learned professions, such as medicine and law.

> We have noted that "[i]t is important to maintain this distinction [between tort and contract law] because the two theories serve very different purposes." Tort law "rests on obligations imposed by law." On this score, we said "[t]ort law is rooted in the concept of protecting society as a whole from physical harm to person or property." Further explicating the foundations of tort law, we wrote that "[t]ort law was designed to protect people from unexpected losses that amount to an overwhelming misfortune that a person may be unprepared to meet." Hence, tort law "serves the 'prophylactic' purpose of preventing future harm; payment of damages provides a strong incentive to prevent the occurrence of harm." Because tort law protects society as a whole, recovery in appropriate circumstances can include punitive or exemplary damages, which are designed "to punish the wrongdoer and to deter the wrongdoer and others from engaging in similar conduct."
>
> In contrast, contract law "is based on obligations imposed by bargain, and it allows parties to protect themselves through bargaining." Contract law does not involve the same broader societal concerns as tort law for "the individual limited duties implicated by the law of contracts arise from the terms of the agreement between the particular parties." Thus, the damages allowed in a contract action "[are] limited to the parties to the contract or those for whose benefit the contract was made." Because the law encourages economic exchanges and seeks to foster predictability, punitive damages are not allowed in a breach of contract action; to allow otherwise would chill the formation of contracts and reduce predictability. Parties who enter into contracts expect courts to enforce the terms, which the law requires unless the contract is for an illegal purpose or a party lacked capacity. Essentially, contract law is based upon the principles of free will and consent, whereas tort law is based upon the principles of risk-sharing and social duties.

*Id.*, ¶¶ 27–28 (alteration in original; citations omitted; footnote call number omitted).

805

*Chase Scientific Research, Inc. v. NIA Group, Inc.*, 749 N.E.2d 161, 166 (N.Y. 2001).

¶ 30.   Finally, the Nebraska Court of Appeals had to consider whether the statute of limitations governing professional negligence actions applied to registered abstracters[5] in *Cooper v. Paap*, 634 N.W.2d 266 (Neb. Ct. App. 2001). The court conducted a survey of the development of the definition of "professional" in Nebraska, including a discussion of *Tylle v. Zoucha*, 412 N.W.2d 438 (Neb. 1987), where the Nebraska Supreme Court settled on a dictionary definition of "profession" to serve as the working definition in Nebraska:

> Webster's Third New International Dictionary, Unabridged 1811 (1981), defines profession as:
>
> 4a: a calling requiring specialized knowledge and often long and intensive preparation including instruction in skills and methods as well as in the scientific, historical, or scholarly principles underlying such skills and methods, maintaining by force of organization or concerted opinion high standards of achievement and conduct, and committing its members to continued study and to a kind of work which has for its prime purpose the rendering of a public service . . . .
>
> In our opinion, this language best defines a profession. The definition stresses the long and intensive program of preparation to practice one's chosen occu-

---

[5] For those who have never toiled in the bowels of the register of deed's office attempting to accurately decipher handwritten documents of title, an "abstracter" prepares an "abstract of title," which is a "concise statement, usu. prepared for a mortgagee or purchaser of real property, summarizing the history of a piece of land, including all conveyances, interests, liens, and encumbrances that affect title to the property." BLACK'S LAW DICTIONARY 10 (8th ed. 2004). The abstract of title has been largely replaced by title insurance.

pation traditionally associated only with professions. It does not stress the difference between manual and intellectual labor which, while a trademark of the traditional professions, would seem to exclude some occupations commonly considered to be professions even though manual or physical . . . .

*Tylle*, 412 N.W.2d at 440–41. The Nebraska Court of Appeals reviewed cases that had applied the *Tylle* definition and pointed out that they had expanded the definition to include other characteristics such as a college degree, licensing and a code of ethics. *Cooper*, 634 N.W.2d at 272–73.

¶ 31. Two other characteristics of what constitutes a "profession" were set out in a decision not involving computer consultants. The Court of Appeals of New York observed that the term "professional" is commonly understood to refer to the learned professions, such as medicine and law. *Chase Scientific Research*, 749 N.E.2d at 166. The court went on to remark, "[A] professional relationship is one of trust and confidence, carrying with it a duty to counsel and advise clients." *Id.*

¶ 32. We believe that the six characteristics of a profession, outlined in *Hospital Computer Systems, Inc*, 788 F. Supp. at 1361, and the two additional characteristics from *Chase Scientific Research* serve as a template to measure whether an occupation is a "profession." There is no evidence in the record that lets us decide if the occupation of computer consultants is a "profession." From our own experience, we know that many computer skills are learned "hands on" and not during long and intensive training. We also know that the state of Wisconsin does not license computer consultants. We are not aware of any enforceable code of ethics governing computer consultants. Moreover, al-

807

lowing Racine County to pursue contract remedies promotes the very different purposes of tort law and contract law described by our supreme court in *Mackenzie v. Miller Brewing Co.*, 2001 WI 23, ¶¶ 27–28, 241 Wis. 2d 700, 623 N.W.2d 739.

¶ 33. We conclude that computer consultants are not professionals and the agreement between Racine County and Oracular was for services and not professional services.

### NECESSITY OF EXPERT TESTIMONY

■

¶ 34. We point out the obvious: our conclusion that a computer consultant is not a professional only affects whether the County can pursue contract remedies rather than tort remedies. Whether or not the County must present expert testimony to support its contract claims still must be answered. *See Grace*, 195 Wis. 2d at 159. We addressed the issue of whether expert testimony is necessary to support a negligence claim in *Trinity Lutheran Church v. Dorschner Excavating, Inc.*, 2006 WI App 22, ¶ 26, 289 Wis. 2d 252, 710 N.W.2d 680:

> Expert testimony is not generally required to prove a party's negligence, and requiring expert testimony before a claim can get to the jury is an extraordinary step that should be ordered "only when unusually complex or esoteric issues are before the jury." Where the presence or absence of negligence is "reasonably comprehensible to the jury," even though inferences are involved, expert testimony is not necessary. We conclude the negligence claim . . . is one that was "reasonably comprehensible to the jury." (Citations omitted.)

¶ 35. This principal applies equally to a breach of contract action because it is a general rule that expert testimony is not necessary when the issue is within the realm of the ordinary experience of the average juror. *See Netzel v. State Sand & Gravel Co.*, 51 Wis. 2d 1, 6, 186 N.W.2d 258 (1971). It is only when the jury will be presented with complex and esoteric issues that expert testimony must be presented. *Id.* at 7.

¶ 36. The issues the County were pursuing are not complex and esoteric. In evidentiary affidavits opposing Oracular's motion for summary judgment, the County asserted specific breaches of contract. First, the agreement required that Oracular provide training for the County's employees who would be using the software. The County's human resources manager averred that the first trainer provided by Oracular was, "for all practical purposes, incompetent," and the second trainer was "not capable of properly training." Thus, the County had to hire, at its own expense, trainers from a third party. Also, Oracular was to provide training specific to the software's security menus and, because it failed to provide a competent trainer and complete training, two Racine County employees had to attend three days of training at the County's expense.

¶ 37. The second major breach the County is claiming is that Oracular failed to fulfill the contract on a timely basis. In evidentiary affidavits, the County established that the parties had agreed on a Go-Live date of September 7, 2004. The County's finance director averred that on September 7, 2004, he estimated that the project was only thirty-four percent complete. In his affidavit, the finance director listed six different Go-Live dates that he claimed Oracular passed without completing the project. According to the finance direc-

tor, when the County terminated the agreement on February 16, 2006, no more than fifty-three percent of the project was completed.

■

¶ 38. Requiring expert testimony is an extraordinary step, *Weiss v. United Fire and Casualty Co.*, 197 Wis. 2d 365, 379, 541 N.W.2d 753 (1995), that should be taken only "when the issue to be decided requires an analysis that would be difficult for the ordinary person in the community." *State v. Blair*, 164 Wis. 2d 64, 75, 473 N.W.2d 566 (Ct. App. 1991). Whether Oracular provided competent training is neither complex nor esoteric. And, similarly, whether a contract is performed in a timely manner is simple and obvious to the average juror. A jury would not need "special knowledge or skill or experience" to properly understand and analyze Oracular's conduct. *See DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 579, 547 N.W.2d 592 (1996).

¶ 39. Even if the agreement between the County and Oracular was a professional services contract, we would reach the same result. Contrary to the circuit court's holding, expert testimony is not required as a matter of law to prove negligence in performance of a professional services contract. *Hoven* and *Micro-Managers* require only that, in actions on professional services contracts, negligence must be established for recovery; neither of those cases mandate expert testimony on professional services contracts.

■■

¶ 40. When confronted with a professional services contract and a claim of professional negligence or malpractice the general rule is:

810

While not required in every malpractice case, expert testimony will generally be required to satisfy this standard of care as to those matters which fall outside the area of common knowledge and lay comprehension. Stated differently, but to the same effect, expert testimony is not necessary "in cases involving conduct not necessarily related to legal expertise where the matters to be proven do not involve 'special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of [persons], and which require special learning, study or experience.' "

*Pierce v. Colwell*, 209 Wis. 2d 355, 362, 563 N.W.2d 166 (Ct. App. 1997) (alteration in original; citation omitted).

¶ 41. This general rule is applicable across the entire spectrum of professional negligence cases: medical malpractice, *Cramer v. Theda Clark Mem'l Hosp.*, 45 Wis. 2d 147, 151–52, 172 N.W.2d 427 (1969); legal malpractice, *Olfe v. Gordon*, 93 Wis. 2d 173, 181–82, 286 N.W.2d 573 (1980); nursing home malpractice, *Kujawski v. Arbor View Health Care Ctr.*, 132 Wis. 2d 178, 181, 389 N.W.2d 831 (Ct. App. 1986); architect malpractice, *see Herkert v. Stauber*, 106 Wis. 2d 545, 570, 317 N.W.2d 834 (1982); and chiropractic malpractice, *Kerkman v. Hintz*, 138 Wis. 2d 131, 406 N.W.2d 156 (Ct. App. 1987).

¶ 42. The County does not allege that Oracular breached the contract because of a lack of professional expertise. It does not assert that Oracular breached the contract by failing to comply with industry standards during the installation of the software. Rather, it seeks to hold Oracular liable for breaching the contract by not completing the project in a timely manner and by not providing training. While specific steps in installing software and making it operational may require "special knowledge or skill or experience on subjects which are

811

not within the realm of the ordinary experience of [persons], and which require special learning, study or experience;" completing an agreement by the date agreed to and providing competent training are within the realm of the ordinary experience of the average juror.

## Conclusion

¶ 43. Oracular does not have the characteristics shared by the learned professions considered as professionals; therefore, its contract with the County is a simple contract for services and not a professional services contract. The fact that Oracular was providing complex services, necessary for the County to operate efficiently, does not transform a breach of contract action into a professional negligence action.

¶ 44. Expert testimony is only required when the issue is esoteric and complex; failure to complete a project by a negotiated deadline and failure to provide competent and sufficient training does not fall into that category. Therefore, the County does not have to present expert testimony on those issues to recover on its breach of contract claim. Even if the agreement between the County and Oracular were a professional services contract, expert testimony is not required as a matter of law. Oracular's alleged breaches of the agreement are within the realm of the ordinary experience of the average juror.

*By the Court.*—Order reversed and cause remanded with directions.